UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| | |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-4639-GER |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
| Debtors. | *Joint Administration Motion Pending* |
| _____/ | |
| | |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
| Applicable Debtors. | *Emergency Hearing Requested* |
| _____/ | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I)
APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THEIR ASSETS, (II) ESTABLISHING PROCEDURES
FOR THE ASSUMPTION AND/OR ASSIGNMENT BY THE DEBTORS OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (III) APPROVING MINIMUM
OVERBID AMOUNT AND A BREAK-UP FEE, (IV) APPROVING FORM AND MANNER OF
NOTICE OF BIDDING PROCEDURES, AND (V) SETTING OBJECTION DEADLINES**

Pioneer Aerospace Corporation d/b/a ASR-Pioneer ("**Pioneer**") and S.E., Inc. d/b/a Strong

Enterprises ("**Strong**" and together with Pioneer, the "**Debtors**") by and through their undersigned

attorneys, respectfully request the entry of an order by this Court (i) approving bidding procedures

in connection with the sale by the Debtors of substantially all of their business operating assets

(the "**Assets**") located in Bloomfield, Connecticut (the "**Connecticut Location**"), Columbia,

Mississippi (the "**Mississippi Location**"), Milton, Florida (the "**Milton Location**"), and Orlando,

Florida (the "**Orlando Location**," and together with the Connecticut Location, the Mississippi

Location, and the Milton Location, each a "**Location**" and, collectively, the "**Locations**") to

Paradigm Parachute and Defense, Inc. or its designee (the "**Stalking Horse Bidder**") as to the

Mississippi Location, the Milton Location, and the Orlando Location, and such other bidders as

may qualify as a stalking horse bidder for the Connecticut Location, (ii) establishing procedures for the assumption and/or assignment by the Debtors of certain executory contracts and unexpired leases to which the Debtors are a party, (iii) approving a minimum overbid amount and an expense reimbursement in connection with such sale, (iv) approving the form and manner of notice of the bidding procedures, and (v) setting deadlines for objections to the sale.  In support of this Motion, the Debtors state as follows:

## I.  Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§105, 363, 365, 1107 and 1108 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

## II.  General Background

2.      On November 1, 2023 (the "**Petition Date**"), the Debtors and Aviation Resources, Inc. ("**ASR**") filed their Voluntary Petitions for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

3.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Debtors' Chapter 11 cases are being jointly administered for procedural purposes only.

5.      Pioneer Aerospace is a recognized leader in the design and manufacture of state-of-the-art aerodynamic deceleration systems. These systems support specialized tactical, personnel, cargo, humanitarian, weapons, and space exploration programs. Additionally, Pioneer operates Airlift Technologies International, based in Milton, Florida, a manufacturing and

2

engineering company that specializes in the design and production of aerial delivery systems, airdrop qualification testing, airdrop load design, systems related logistic support, and complete and comprehensive training of all ground and air crew personnel involved in cargo airdrops. Strong manufactures parachutes and related products for both military solutions and commercial customers. Both Pioneer and Strong are wholly-owned subsidiaries of Aviation Resources, Inc. For more information, please see the Debtors' Joint Case Management Summary.

### III.    Stalking Horse Asset Purchase Agreement

6.      On November 1, 2023, the Debtors and the Stalking Horse Bidder executed an Asset Purchase Agreement (the "**Stalking Horse APA**"), which provides for the sale by the Debtors, and the purchase by the Stalking Horse Bidder, of substantially all of the operating assets (the "**Assets**") of the Debtors at the Mississippi Location, Milton Location, and Orlando Location for $2.25 million in cash. The Debtors have filed or are filing separately a motion to authorize the sale of the Assets and for the assumption and assignment of executory contracts and unexpired leases (the "**Sale Motion**"), with the Sale Motion incorporating the process for which approval is requested by this Motion. An executed copy of the Stalking Horse APA is attached to this Motion as **Exhibit A** and is incorporated herein by this reference thereto (the attached copy does not include the Schedules to the Stalking Horse APA, which will be filed separately or with the Sale Motion).[1] The Debtors are in continuing discussions for a potential stalking horse bid on the Connecticut Location, and will supplement the record as necessary and appropriate.

7.      The Debtors have determined that it would be in the best interests of their creditors and their estates to maximize value through a sale of the Assets pursuant to Section 363 of the Bankruptcy Code. Absent such a sale, the Debtors would most likely be facing a liquidation under

---

[1] In order to reduce photocopying and mailing costs, a copy of the Purchase Agreement is not being served on all parties listed in the Certificate of Service below. Any party wishing to receive a copy of the Purchase Agreement may do so upon written request to undersigned counsel for the Debtors.

Chapter 7 of the Bankruptcy Code, which would achieve far less for creditors than a sale as a going concern. As presently contemplated, the sale will be pursuant to Section 363 of the Bankruptcy Code. Following closing, the Debtors will consider proposing a joint plan of liquidation providing for the distribution of available funds to their creditors.

## IV.    Relief Requested

### A.    *Bidding and Sale Procedures*

8.      This Motion is filed to seek approval of bidding procedures in connection with the sale of the Assets, including (a) approval of procedures for the submission of competing bids, (b) approval of procedures for the assumption and assignment of executory contracts and unexpired leases, (c) approval of overbid amounts and an expense reimbursement to the Stalking Horse Bidder, and (d) approval of the form and manner of notice of the bidding procedures.

9.      The Debtors believe that the bidding procedures set forth in this Motion will assist in determining the highest and best offer available to the Debtors for the sale of the Assets and the other transactions contemplated by the Stalking Horse APA and any stalking horse bid for the Connecticut Location.  The Debtors believe that these procedures are favorable to the Debtors, their estates and creditors, and create a fair and level playing field for all interested bidders.  The Debtors submit that these proposed procedures will satisfy the interests of all creditors in assuring that the Debtors will achieve the maximum value for the Assets and the other transactions contemplated by the Stalking Horse APA.

10.      The Debtors request that the Court conduct a hearing on this Motion, as soon as practicable, to consider entry of an order approving the bidding procedures set forth herein and approving the form and manner of notice with respect thereto (the "**Bid Procedures Order**"), the proposed form of which is attached hereto as **Exhibit B.**

4859-9117-8632, v. 3

11.     The Debtors request that this Court approve the following procedures (the "**Bid Procedures**") for the submission and consideration of any written competing bid ("**Bid**") by any competing bidder ("**Bidder**") for the Assets:[2]

| The proposed dates and deadlines in connection with the Bid Procedures are as follows: | |
|---|---|
| Contracts Assumption Notice Deadline | Wednesday, November 8, 2023 |
| Bid Deadline | Thursday, November 16, 2023 at 5:00 p.m. |
| Cure Amount Objection Deadline | Friday, November 17, 2023 at 5:00 p.m. |
| Auction | Monday, November 20, 2023 at 12:00 p.m. |
| Sale Objection Deadline | Monday, November 20, 2023 |
| Assumption Objection Deadline | Monday, November 20, 2023 |
| Sale Hearing | Tuesday, November 21, 2023 at [      ] |

a.     Prior to the receipt by a prospective Bidder of any information from, and access to, the Debtors, each such Bidder will be required to execute a confidentiality and non-disclosure agreement in form and content acceptable to the Debtors (the "**NDA**"), to the extent not already executed.  Upon the execution of an NDA, each Bidder will be granted access to the Debtors' virtual data room.

b.     At least five (5) business days prior to the Bid Deadline (as defined below), or such later date agreed to by the Debtors after prior consultation with the Consultation Party, a Bidder will be required to provide to the Debtors relevant background and financial information (including, without limitation, such Bidder's latest available audited and unaudited financial statements) satisfactory to the Debtors demonstrating the Bidder's financial ability to close and to consummate an acquisition of the Assets, such as (i) evidence of the Bidder's ability to assume or satisfy the terms and obligations of the Bidder's Agreement and pay the purchase price provided for therein and to provide adequate assurance of future performance by such Bidder of the Contracts, and/or (ii) an unconditional lending commitment from a recognized financial institution or cash sources in the amount of the cash consideration set forth in the Bid.  A Bidder (including the Stalking Horse Bidder) that timely submits the foregoing documents and information and that the Debtors determine, in consultation with the Consultation Party, is financially able to consummate the purchase of the Assets shall be a "**Qualified Bidder**" and shall be entitled to then submit a Bid for the Assets as described in paragraph 7(e) below.  The Stalking Horse Bidder is, and shall at all times remain, a Qualified Bidder and the bid submitted by the Stalking Horse Bidder a Qualified Bid.

---

[2] The summary below is qualified in all respects by the proposed form of the Bid Procedures Order, which shall control in the event of any inconsistency.

5

c.       Any Qualified Bidder desiring to make a Bid for all or any of the Assets shall deliver the Bid, by electronic mail transmission, to counsel to the Debtors, Daniel R. Fogarty, Esq., Stichter, Riedel, Blain & Postler, P.A., (dfogarty@srbp.com), and the financial advisors to the Debtors, Charles Reardon and Michael Freeman, Asgaard Capital, LLC, (creardon@asgaardcapital.com, mfreeman@asgaardcapital.com), **by no later than 5:00 p.m. (Eastern Prevailing Time) on [two business days before the Auction]** (or such later time or date agreed to by the Debtors) (the "**Bid Deadline**").  Upon receipt of a Bid, counsel to the Debtors shall deliver each such Bid, by electronic mail transmission, to (i) the Office of the United States Trustee, Attn: [     ], Esq., [        ] (@usdoj.gov), (ii) the Subchapter V Trustee, [    ], and (iii) counsel to any Qualified Bidder who submits a Qualified Bid.

d.       **Notwithstanding anything to the contrary in these Bid Procedures, any Bidder may submit a Bid to purchase only such Assets owned by or utilized by the Debtors as it deems necessary or appropriate, whether any specific Assets owned or utilized by the Debtors are proposed to be purchased by the Stalking Horse Bidder pursuant to the Stalking Horse APA.  By way of example but not by way of limitation, a Bidder may submit a Bid to purchase the Assets of a single Debtor or the Assets of more than one of the Debtors, only the Assets utilized at one Location or the Assets utilized at more than one Location, and so forth.  There shall be no restrictions of any nature as to the number and type of Assets that a Bidder may seek to purchase.**

e.       In order to be a qualified bid (a "**Qualified Bid**"), a Bid submitted by a Qualified Bidder must include, or be in compliance with, the following (unless any such item is otherwise waived in writing by the Debtors after prior consultation with the Consultation Party):

i.       A copy of the initial written purchase offer in the form of an asset purchase agreement, executed by such Qualified Bidder, in substantially the form of the Stalking Horse APA (collectively, the "**Bidder's Agreement**"); provided, however, that any Bidder's Agreement that contain terms or language different from the Stalking Horse APA must be black-lined to show any changes made by such Qualified Bidder to the form of the Stalking Horse APA, as the case may be. The Debtors may accept modifications to the Stalking Horse APA as submitted by a Qualified Bidder who otherwise complies with the Bid Procedures if the Debtors determine, in the exercise of their business judgment and after prior consultation with the Consultation Party, that the proposed modifications result in a higher and better offer for the Assets or the proposed modifications are necessary due to the fact that the Qualified Bidder is not seeking to purchase substantially all of the Assets.

ii.       An initial Bid with a purchase price above the total purchase price offered by the Stalking Horse Bidder in the Stalking Horse APA (the "**Stalking Horse Bidder Purchase Price**") in an amount equal to or greater than the total sum of the Stalking Horse Bidder Purchase Price plus cash in the amount of not less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), provided that, if the Bid is for less than all of the Assets, the initial Bid shall be an amount equal to or greater than the Stalking Horse Bidder Purchase Price for the applicable Assets

located at and/or related one (1) or more Locations and subject to the Bid, plus cash in the amount of not less than One Hundred Thousand and 00/100 Dollars ($100,000.00) (collectively, the "**Initial Overbid Amount**") per each location. If a Bid is for the Assets at one (1) or more Locations, the Stalking Horse Bidder Purchase Price for the applicable Assets shall be the value ascribed to the Assets at such Location(s) as set forth in the Purchase Price Allocation (as defined in the Stalking Horse APA, but subject to Stalking Horse Bidder's ability to adjust the Purchase Price Allocation (as set forth in the Stalking Horse APA)). The cash portion of the Qualified Bidder's purchase price shall be payable, in immediately available funds, at the closing of the transaction. Any Bid for less than all of the Assets shall be for the purchase of all of the Assets located at and/or related to one (1) or more Locations.

iii.     Prior to the Auction, the Debtors, in their reasonable discretion and after consultation with the Consultation Party, shall have the right to (a) accept any Qualified Bidder's Bid as a stalking horse Bid for the Assets located at and/or related to less than all but for one (1) or more Locations provided that (i) such Bid is equal to or greater in amount than the Initial Overbid Amount attributable to the Assets located at and/or related to such Location(s) and that the sum of such Bid and the Initial Overbid Amount attributed to the Assets located at and/or related to the remaining Locations exceeds the amount of the stalking horse Bid, and (ii) such Bid is otherwise in compliance with the Bid Procedures, and grant customary bid protections for such stalking horse Bids including, without limitation, a breakup fee in an amount equal to the lesser of Fifty Thousand and 00/100 Dollars ($50,000.00) or three percent (3%) of the purchase price for the Assets contained in the stalking horse Bid, and (b) set reserve prices for the Assets located at and/or related to one (1) more Locations.

iv.     To the extent practicable, a statement that specifically sets forth the extent to which the Bid is higher and better than the offer set forth in the Stalking Horse APA, including an allocation of the cash components of the Bid to (A) the Assets and the Locations of each of the Debtors being purchased by the Qualified Bidder, (B) the claims against, and liabilities of, the Debtors being assumed as Assumed Liabilities.

v.     A designation of any executory contracts or unexpired non-residential real property leases such Qualified Bidder desires the Debtors to assume and/or assign to such Qualified Bidder under its Bidder's Agreement with the Debtors (the "**Designated Contracts**"), as well as a designation of any governmental approvals or consents required in connection therewith and, in the case of assumption and/or assignment, documents and information necessary to confirm adequate assurance of future performance by such Qualified Bidder pursuant to Section 365 of the Bankruptcy Code. In the event that any of the Designated Contracts are not included in the list of Assumed Contracts set forth in the Stalking Horse APA, such Qualified Bidder shall, within one (1) business day of the Bid Deadline, serve a copy of this Order and Exhibit A attached hereto on any party to such additional Designated Contract(s) and thereafter file a certificate of service with the Court.

vi.         The Bid shall not be contingent upon the receipt of financing or due diligence by the Qualified Bidder past the Bid Deadline.

vii.        The Bid shall provide that the Assets owned or held by the Debtors shall be sold on an "AS IS, WHERE IS" basis and the representations, warranties and covenants of the Debtors set forth in the Bidder's Agreement with the Debtors shall expire as of the closing of the sale transaction.

viii.       The Bid shall be valid and enforceable and binding on the Qualified Bidder through the closing date of its sale transaction.  The Bidder's Agreement shall be subject to acceptance by the Debtors solely by their execution thereof and necessary Court approval.

ix.         The Bid shall not contain any conditions precedent to such Qualified Bidder's obligation to purchase the Assets and assume and perform any liabilities to be assumed and to close the sale transaction, other than as may be included in the Stalking Horse APA or as agreed by the Debtors after prior consultation with the Consultation Party.

x.          A good faith deposit in the amount of not less than the lesser of (i) ten percent (10%) of the Initial Overbid Amount, but in no event less than Fifty Thousand and 00/100 ($50,000.00), or (ii) Two Hundred Thousand and 00/100 Dollars ($200,000.00) (the "**Bid Deposit**") shall be delivered by the Qualified Bidder, by wire transfer of immediately available funds, to SRBP by no later than the Bid Deadline (or such later time or date agreed to by the Debtors after prior consultation with the Consultation Party).  The Bid Deposit shall be deposited into a non-IOTA non-interest bearing trust account maintained by SRBP and shall be held in escrow subject to the terms of this Order.  SRBP will provide wire transfer instructions upon any request received from a Qualified Bidder.  Such Bid Deposit will be non-refundable to the Qualified Bidder in the event such Qualified Bidder's Bid is approved by the Court at the Sale Hearing as the highest and best offer for the Assets and such Qualified Bidder fails to close on the purchase of the Assets for any reason (subject to any conditions to closing set forth in its Bidder's Agreement approved by the Court).  The Bid Deposit will be applied against the purchase price paid to the Debtors by the Qualified Bidder at the closing.  Within fifteen (15) days following the entry of the Sale Order (as defined below), SRBP will return the Bid Deposit of any Qualified Bidder (except the Backup Bidder) that is not selected as having the highest and best offer for the Assets at the Sale Hearing. The Bid Deposit of the Backup Bidder shall be returned to the Backup Bidder as provided in paragraph 7(o) below.

xi.         Full disclosure of each entity that will be participating in such Bid (including, but not limited to, disclosure of any "affiliate" or "insider" (as those terms are defined in Sections 101(2) and 101(31), respectively, of the Bankruptcy Code) of the Debtors that may have an interest in any such entity or any other person with an interest in, control over, or relationship with the Qualified Bidder) in order to satisfy the requirements set forth in Sections 363(m), 363(n), 365(b), and

4859-9117-8632, v. 3

365(f)(2) of the Bankruptcy Code.  On or before the Bid Deadline, the Stalking Horse Bidder shall simultaneously submit the foregoing disclosure to the Debtors.

xii.     The Bid shall set forth (A) any applicable governmental, regulatory, or other approvals and any applicable consents that would be required to be obtained were the Qualified Bidder to be the Successful Bidder, (B) all actions taken or to be taken to obtain such approvals or consents, (C) any approvals or consents obtained, and (D) the Qualified Bidder's best estimates as to the likelihood and timing of any such approvals or consents.  On or before the Bid Deadline, the Stalking Horse Bidder shall simultaneously submit the foregoing information to the Debtors and the Consultation Party.

f.     An auction (the "**Auction**") to consider any competing Qualified Bids in respect of the Assets will be held at the offices of Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602 (or at such other location designated by the Debtors in Tampa, Florida) **on____.m.** (or such later time or date agreed to by the Debtors, after prior consultation with the Consultation Party, or as may be scheduled by the Court).  By no later than 5:00 p.m. on        ,     the     Debtors,     after consultation with the Consultation Party, will advise each of the Qualified Bidders as to whether its Bid is a Qualified Bid and whether an Auction will be held as scheduled above. All potential Qualified Bidders or their authorized representative(s) with full authority to participate in the Auction must be present in person at the Auction. Requests to participate by video conference will be considered on a case-by-case basis.

g.     The Debtors will file a notice with the Court at least one (1) day prior to the date of the Auction indicating the number of Qualified Bids received and the names of the Qualified Bidders, and will serve such notice, along with copies of the Qualified Bids, by electronic mail transmission, on counsel to or representatives of all Qualified Bidders.

h.     The Debtors and their professionals shall direct and preside over the Auction. The Auction will be conducted in rounds.  To maximize the value of the Assets for the estates and all creditors, the Auction will be conducted to allow bidding each round on all or less than all Assets, as established by the Debtors and their professionals; provided, however, that the Debtors will not consider as a higher or better offer a bid that provides less for the Assets of one of the Debtors than would be provided for the Assets of such Debtor in a bid for all of the Assets. Bidding will begin at the purchase price stated in the highest and best Qualified Bid or combination of Qualified Bids (the "**Initial Bid**") as selected by the Debtors in consultation with the Consultation Party prior to the commencement of the Auction and announced at the start of the Auction.  All subsequent bids at the Auction above the Initial Bid (including any subsequent bid which may be made by the Stalking Horse Bidder) must be in incremental increases of at least One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "**Subsequent Overbid Amount**" and, together with the Initial Overbid Amount, the "**Overbid Amounts**").  For the avoidance of doubt, the Stalking Horse Expense Reimbursement shall be credited to each bid of the Stalking Horse Bidder made at the Auction for all the Assets.  The Debtors shall have the ability to alter the bid increments at the Auction to maximize the value of the Assets for the estates.

4859-9117-8632, v. 3

i.      Any Qualified Bidder (including the Stalking Horse Bidder) shall be entitled to submit further bids at the Auction. Any successive bid submitted at the Auction shall be irrevocable through the Auction process unless and until it is declared to not be the highest and best bid. The allocation of any higher and better increased bid amounts submitted at the Auction between the Assets of the Debtors as applicable shall be resolved by the Debtors after prior consultation with the Consultation Party. At the Auction, the Debtors may request a Qualified Bidder to provide additional information demonstrating the Qualified Bidder's financial ability to close and to consummate an acquisition of the Assets. The competitive bidding process among Qualified Bidders at the Auction shall continue according to the Bid Procedures until the Debtors determine, in the exercise of their business judgment and after consultation with the Consultation Party, that one or more Qualified Bidders have made the highest and best offer to purchase the Assets, either through a single Qualified Bid for all of the Assets or through more than one Qualified Bid for separate Assets.

j.      The Debtors, after prior consultation with the Consultation Party, may continue or adjourn the Auction from time to time with reasonable notice to the Qualified Bidders. The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent with the Bid Procedures.

k.      At the Sale Hearing, the Debtors will inform the Court of the results of the Auction and will recommend to the Court the Qualified Bid or combination of Qualified Bids that they consider to be the highest and best offer(s) for the Assets, after taking into account all aspects of the Stalking Horse APA, the Qualified Bids and the Bidder's Agreement (including, without limitation, the amount of the purchase price, the method and timing of the payment of the purchase price, any contractual adjustments to the purchase price, any liabilities of the Debtors to be assumed, the provision for adequate assurance of future performance of the Assumed Contracts, any conditions to closing, the time for closing, and the representations, warranties, and covenants to be provided by the Debtors, prior to closing). The value of a Qualified Bid, for purposes of these proceedings, shall be determined by comparing, among other things, (i) the type, number and nature of any changes in the Bidder's Agreement requested by each Qualified Bidder, (ii) the extent to which such modifications are likely to delay the closing of the sale to such Qualified Bidder, and the cost to the Debtors and their estates of such modifications or delay, (iii) the extent to which such Qualified Bid includes the purchase of all or less than all of the Assets, (iv) the type and amount of consideration to be received by the Debtors' estates, individually and collectively, (v) the existence of any financing, due diligence or other contingencies, (vi) the amount of any cure payments, which, if paid, would reduce the proceeds available for distribution to creditors of the Debtors, (vii) the provision for adequate assurance of future performance of the Assumed Contracts, (viii) the likelihood of the Qualified Bidder's ability to close the sale transaction, including the likelihood of receipt by such Qualified Bidder of the necessary approvals with respect to the Assumed Contracts following the closing, and (ix) the net benefit to the Debtors' estates and their creditors, including but not limited to the amount of proceeds to be received by the Debtors individually and collectively from one transaction for the purchase of all of their Assets as compared to the aggregate proceeds to be received by the Debtors from piecemeal sales of their Assets. All Qualified Bidders or their authorized representatives must be present at

the Sale Hearing.  The Court will determine the highest and best offer for the Assets at the Sale Hearing.  ANY SALE WILL BE SUBJECT TO APPROVAL OF THE COURT.

l.      Prior to the Auction, the Debtors, in their reasonable discretion and after consultation with the Consultation Party, shall have the right to reject any and all Bids other than any Bid that is a Qualified Bid.

m.      If any Bid does not conform to all of the requirements set forth above, such Bid will not be considered by the Court or be admissible at the Sale Hearing, unless otherwise agreed by the Debtors, after prior consultation with the Consultation Party, or otherwise ordered by the Court.

n.      The Qualified Bidder whose Qualified Bid is selected by the Court at the Sale Hearing as the highest and best offer for the Assets shall be deemed the "**Successful Bidder**".

o.      The Court shall register the second highest Qualified Bid and Qualified Bidder (the "**Backup Bidder**"), whose Bidder's Agreement shall be a binding contract with the Debtors, respectively, and who shall close, without the necessity of further Court order, in the event the Successful Bidder fails to consummate the acquisition of the Assets in accordance with its Bidder's Agreement and the order granting the Sale Motion (the "**Sale Order**").  Any closing with the Backup Bidder shall occur within ten (10) days of written notification to the Backup Bidder that the Successful Bidder failed to close.  The Bid Deposit of the Backup Bidder shall be retained by SRBP until the closing of the sale with the Successful Bidder, and shall be returned to the Backup Bidder within two (2) business days following such closing.  In the event the Successful Bidder fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Successful Bidder), the Debtors shall keep the Bid Deposit of such Successful Bidder (or the Deposit in the case of the Stalking Horse Bidder) and the Debtors or their estates reserve the right to pursue all available remedies, whether legal or equitable, available to the Debtors against such party.  In the event the Successful Bidder fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Successful Bidder), and the Backup Bidder thereafter fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Backup Bidder), the Debtors shall keep the Bid Deposit of such Backup Bidder (or the Deposit in the case of the Stalking Horse Bidder) and the Debtors or their estates reserve the right to pursue all available remedies, whether legal or equitable, available to the Debtors against such party.

p.      At the Sale Hearing, the Debtors will request that the Court make certain findings regarding the Auction, including, among other things, that (i) the Auction was conducted and the Successful Bidder and the Backup Bidder were selected in accordance with the Bid Procedures, (ii) the Auction was fair in substance and procedure, (iii) the bids of the Successful Bidder and the Backup Bidder were Qualified Bids as defined in this Order, and (iv) consummation of the sale contemplated by the bid of the Successful Bidder will provide the highest and best value for the Assets and is in the best interests of the Debtors, their estates, and their creditors.  At the Sale Hearing, the Debtors will also request

4859-9117-8632, v. 3

that the Court find that each of the Successful Bidder and the Backup Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code such that the reversal or modification on appeal of the sale of the Assets to the Successful Bidder or the Backup Bidder shall not affect the validity of the sale to the Successful Bidder or the Backup Bidder, whether or not the Successful Bidder or the Backup Bidder knew of the pendency of the appeal.

q.      After the Sale Hearing, the Debtors shall submit to the Court a proposed Sale Order authorizing and approving the Bidder's Agreement executed by the Successful Bidder or the Backup Bidder, as applicable (or the Stalking Horse APA if such party is the Stalking Horse Bidder), and authorizing the Debtors' execution of, entry into, and consummation of the Successful Bidder's or the Backup Bidder's, as applicable, Bidder's Agreement (or the Stalking Horse APA if such party is the Stalking Horse Bidder).

r.      All Qualified Bidders, the Successful Bidder, and the Backup Bidder shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Bid Procedures, the Auction, or the sale of the Assets.  All purchase agreements shall be governed by and construed in accordance with the laws of the State of Florida.

s.      Except for the Stalking Horse Bidder, or as provided in paragraph 7(e)(iii) above, no Bidder submitting any Bid shall be entitled to any expense reimbursement or any break-up, termination, or similar fee or payment.

## B.      *Procedures for Assumption and/or Assignment of Contracts and Leases*

12.      Pursuant to the Stalking Horse APA, the Debtors will also assume and/or assign to the Stalking Horse Bidder, pursuant to 11 U.S.C. § 365, certain executory contracts and unexpired leases to which the Debtors are a party (collectively, the "**Contracts**"), which Contracts have been designated by the Stalking Horse Bidder in the Stalking Horse APA.  The Sale Motion requests authority to assume and assign the Contracts to the Stalking Horse Bidder, and the Debtors' assumption and assignment to the Stalking Horse Bidder of the Contracts will be conditioned upon the approval of this Court and the closing of the transactions contemplated by the Stalking Horse APA as well as the resolution of the objections, if any, to the Sale Motion filed pursuant to the procedures described below.

13.     The Debtors request that this Court include in the Bid Procedures Order the procedures set forth in paragraphs 14-16 below for objections to the Sale Motion as to the assumption and assignment of the Contracts.

14.     The Debtors request that any lessor or other party to any Contract to be assumed and assigned to the Stalking Horse Bidder that objects to, and/or asserts any cure claims, defaults or any other claims against the Debtors in connection with, the proposed assumption and assignment must file with this Court, on or before the Bid Deadline, any objection to the assumption and assignment of its Contract and/or assertion of claim or default (the "**Objection**"), which Objection shall set forth:

> (a)     the specific grounds for such Objection;

> (b)     any and all defaults of the Debtors (whether monetary or non-monetary) that it alleges are in existence under such Contract and, (i) if such alleged defaults are monetary, the nature of such monetary defaults (including the date and amount of any payment allegedly due under the Contract) and cure amounts, if any, due and owing by the Debtors pursuant to 11 U.S.C. §365(b) and, (ii) if such alleged defaults are non-monetary, the nature of such non-monetary defaults and the amount of money or the type of action required to cure such non-monetary defaults; and

> (c)     any and all claims of any nature whatsoever against the Debtors.

15.     The Debtors further request that this Court enter an order providing that lessors or other parties to such Contracts who fail to timely file written Objections to the proposed assumption and assignment of their Contracts as set forth above shall be conclusively deemed to have waived any such Objections and to have consented thereto and further providing that any party not specifying any default or claim as required herein shall be deemed to have conclusively acknowledged that no default or claim exists under any such Contract.

16.     The Debtors further request that this Court enter an order requiring any creditor, any lessor or other party to a Contract, or any other party in interest filing an Objection to serve the same upon counsel for the Debtors, the Debtors, the Subchapter V Trustee, and counsel for the

4859-9117-8632, v. 3

Stalking Horse Bidder at the addresses listed in paragraph 11 above in a manner designed to assure actual receipt by such parties by the Bid Deadline.

C.     ***Expense Reimbursement and Minimum Overbid Amount***

17.     Pursuant to the Stalking Horse APA, the Stalking Horse Bidder delivered to SRBP a Two Hundred Twenty Five Thousand and 00/100 Dollars ($225,000.00) deposit in escrow to serve as liquidated damages in the event that the Stalking Horse Bidder defaults in its obligations under the Stalking Horse APA.  In addition, to induce the Stalking Horse Bidder to conduct its due diligence as to the Assets and reach agreement on a definitive agreement, the Debtors and the Stalking Horse Bidder agreed in the Stalking Horse APA upon an expense reimbursement not to exceed $ Seventy-Five Thousand and 00/100 Dollars ($75,000.00) (the "**Stalking Horse Expense Reimbursement**") and the Initial Overbid Amount of not less than One Hundred Thousand and 00/100 Dollars ($100,000.00).

18.     The Stalking Horse APA requires the Debtors to pay the Stalking Horse Bidder the Expense Reimbursement as liquidated damages for the Stalking Horse Bidder's time, expenses, and lost opportunities in the event that the Debtors accept an offer from a competing Bidder whose Bid is approved by order of this Court and who closes under its bid.  If the Stalking Horse Bidder is not the winning bidder and/or the Debtors close on another Bid, the Expense Reimbursement will be paid to the Stalking Horse Bidder at the closing from the sale proceeds received. The Debtors believe that the Expense Reimbursement is fair and reasonable, especially after taking into account the significant time, effort and expenses of the Stalking Horse Bidder in conducting its due diligence of the Assets and negotiating the Stalking Horse APA.  In addition, an expense reimbursement encourages an initial Stalking Horse Bidder to act as a stalking horse whose initial bid will be used to attract higher offers.

4859-9117-8632, v. 3

19.     The Stalking Horse Bidder has expended significant amounts of money in reaching a determination to acquire the Assets and in negotiating the Stalking Horse APA.  These efforts will inevitably be of value to any competing bidder, inasmuch as the framework for the transaction will have been structured through the efforts of the Debtors and the Stalking Horse Bidder.  The Stalking Horse Bidder was unwilling to expend substantial time and effort reaching a definitive agreement and performing the necessary due diligence, only to find itself outbid in Court, absent the Expense Reimbursement set forth in the Stalking Horse APA.  In addition, the Debtors have benefited substantially from the willingness of the Stalking Horse Bidder to proceed forward with this transaction, notwithstanding the fact that the transaction is subject to overbid in this Court. For all of these reasons, the Debtors believe that the Stalking Horse Bidder is entitled to the Expense Reimbursement in the event a higher and better offer for the Assets is received and approved by the Court.

20.     The Debtors respectfully submit that the Initial Overbid Amount and the Expense Reimbursement are equitable and in the best interests of the Debtors' estates.  Given the size of the transaction and the amount of diligence and effort required by the Stalking Horse Bidder to complete the transaction, it would be inequitable to allow a bidder to outbid the Stalking Horse Bidder by an amount less than the Overbid Amount.  Additionally, the Stalking Horse Bidder, with the knowledge of the Debtors, has relied upon the Debtors' agreement to the Overbid Amount and the Expense Reimbursement in proceeding with negotiation of the Stalking Horse APA.  Finally, the Debtors believe that without reaching some accommodation with the Stalking Horse Bidder regarding the scope of higher and better offers, the Debtors might have lost the bid from the Stalking Horse Bidder.

D.     *Notice*

21.     The Debtors propose to send the Bid Procedures Order to (a) all parties listed on the Local Rule 1007-2 Parties in Interest List, (b) all parties which, to the knowledge of the Debtors, have or have asserted liens or other interests in the Assets, (c) all lessors or other parties to the Contracts (the "**Contract Parties**"), and (d) any party that has been previously contacted by the Debtors or their representatives or that has expressed an interest in acquiring the Assets (the "**Bidder List**").  By this Motion, the Debtors seek this Court's approval of the form and manner of notice as being adequate and sufficient notice of the bid procedures and the filing of Objections to the assumption and/or assignment of the Contracts.

## V.     Basis for Emergency Relief

22.     Due to the exigent circumstances of these cases, the fixing at this time of procedures for the sale of the Debtors' Assets is essential and necessary.  Certainly, the relief sought would be of considerably greater value if granted immediately.  The Debtors' financial conditions are such that the Closing needs to occur in early December.  Therefore, the Debtors request that the Court consider this Motion and the Bid Procedures on an emergency basis.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein, and such other and further relief as is just and proper.

Dated:  November 2, 2023

/s/ Daniel R. Fogarty
Daniel R. Fogarty (FBN 0017532)
**STICHTER RIEDEL BLAIN & POSTLER, P.A.**
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email: dfogarty@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing *Debtors' Emergency Motion For Entry Of An Order (I) Approving Bidding Procedures In Connection With The Sale Of Substantially All Of Their Assets, (II) Establishing Procedures For The Assumption And/Or Assignment By The Debtors Of Certain Executory Contracts And Unexpired Leases, (III) Approving Minimum Overbid Amount And A Break-Up Fee, (IV) Approving Form And Manner Of Notice Of Bidding Procedures, And (V) Setting Objection Deadlines* have been furnished on November 2, 2023, by the Court's electronic noticing system to all parties receiving CM/ECF electronic noticing.

*/s/ Daniel R. Fogarty*
Daniel R. Fogarty

4859-9117-8632, v. 3

# EXHIBIT A

# STALKING HORSE APA

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into this 1st day of November, 2023 (the "<u>Effective Date</u>"), by and between Paradigm Parachute and Defense, Inc., a Florida corporation or its designee ("<u>Buyer</u>"), on the one hand, and Pioneer Aerospace Corporation, a Delaware corporation d/b/a ASR-Pioneer ("<u>Pioneer</u>"), and S.E., Inc., a Florida corporation d/b/a Strong Enterprises ("<u>Strong</u>," and together with Pioneer, each, a "<u>Seller</u>," and, collectively, the "<u>Sellers</u>"), on the other hand.  Each of the Sellers and Buyer is a "<u>Party</u>" and collectively they are the "<u>Parties</u>" to this Agreement.

## RECITALS

WHEREAS, each Seller is engaged in the business of manufacturing parachutes, pallets, and/or related products for use in the space, defense, and aviation industries (collectively, the "<u>Business</u>");

WHEREAS, in connection with the Business, the Sellers have or had assets on site at certain leased locations located in Columbia, Mississippi (the "<u>Mississippi Location</u>"), Milton, Florida (the "<u>Milton Location</u>" ), and Orlando, Florida (the "<u>Orlando Location</u>," and together with the Mississippi Location, and the Milton Location, each a "<u>Location</u>" and, collectively, the "<u>Locations</u>");

WHEREAS, each Seller and Aviation Safety Resources, Inc., a Florida corporation (collectively, the "<u>Debtors</u>"), have commenced or will commence a voluntary case for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "<u>Bankruptcy Court</u>"), which cases are expected to be jointly administered (the "<u>Bankruptcy Case</u>");

WHEREAS, in the Bankruptcy Case, each Seller has been or will be in possession of its respective assets and in control of its respective business operations as a debtor in possession pursuant to the applicable provisions of the Bankruptcy Code;

WHEREAS, Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, substantially all of the assets, personal and mixed, tangible and intangible, associated with or employed in the operations of the Business and owned by Sellers, as set forth specifically in the schedules attached hereto, and Buyer agrees to assume certain of the obligations of Sellers under specified contracts from and after the Closing (as defined below) and to assume warranty obligations of the Sellers, on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code (the "<u>Transaction</u>");

WHEREAS, Bankruptcy Court approval is required to consummate the Transaction; and

WHEREAS,  the Assets (as defined below) and the Assumed Liabilities (as defined below) include assets and liabilities of Sellers which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving the Transaction (the "<u>Sale Order</u>") pursuant to

Sections 105, 363 and 365 of the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which Sale Order shall include the authorization for the assumption and/or rejection by Sellers of certain executory contracts and/or unexpired leases and the assignment of all assumed executory contracts and/or unexpired leases to Buyer pursuant to Section 365 of the Bankruptcy Code and shall further state and conclude that Buyer is not a successor to Sellers, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and in reliance upon the representations, warranties, conditions and covenants contained herein and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

**Section 1.1 Purchase and Sale of Assets**. Subject to the terms and conditions of this Agreement, the Sellers shall sell, transfer, convey, assign and deliver to Buyer and Buyer shall purchase, acquire and accept from the Sellers, effective as of 12:01 a.m. on the Closing Date (as defined in Section 3.1 below) (the "Effective Time"), all of the right, title and interest of the Sellers in and to the following assets, free and clear of all Encumbrances (as defined herein) (collectively, the "Assets").  Without limiting the foregoing, the Assets shall include the following:

(a)    all tangible personal property, including all machinery, rolling stock, equipment, furniture, computer hardware, instruments, supplies, materials, vehicles and other items of tangible personal property and all rights in tangible personal property in the possession of others owned by the Sellers and used in the operation of the Business at each of the Locations;

(b)    all inventories, including supplies, work-in-process, spare parts and finished goods, if any, at each of the Locations;

(c)    all prepaid expenses, prepaid insurance, deposits and other similar items to the extent related to the operation of the Business at each of the Locations;

(d)    all operating data and records of the Sellers, including books, records, sales and sales promotional data, advertising materials, customer lists, credit information, cost and pricing information, supplier lists, business plans, reference catalogs, and computer programs and electronic data processing software related to any of the foregoing items at or related to each of the Locations (the "Seller Data"), except that minute books and corporate records, tax returns and litigation files of the Sellers, along with the other records described in Section 1.2 shall not be included in the Assets;

(e)    all engineering and production designs, drawings, plans, blue prints, formulae, source code, technology, trade secrets, technical information, process technology, confidential information, know-how and other similar data of the Sellers at or related to each of the Locations;

4892-5980-3269, v. 9

(f)      all claims and rights to and under all contracts, licenses, real property leases, equipment leases, instruments, commitments, agreements and other legally binding arrangements of every type and description relating to the Business at each of the Locations and to which either Seller is a party or by which any of the Assets is bound (the "Contracts") to be assumed and assigned to the Buyer (and not rejected by Sellers), as set forth on Schedule 1.1(f) attached hereto (which Schedule 1.1(f) will be mutually agreed to by the Parties and appended to this Agreement prior to Closing, and which Schedule 1.1(f) may include certain Contracts relating to the Connecticut Location, as mutually agreed upon by the Parties (the "Connecticut Contracts")) (each an "Assumed Contract" and collectively, the "Assumed Contracts"), but specifically excluding any Contracts that are not listed on Schedule 1.1(f) attached hereto (collectively, the "Excluded Contracts");

(g)      all patents, patent applications, inventions and discoveries that may be patentable, registered and unregistered trademarks, including those patents, patent applications, inventions, discoveries, and registered and unregistered trademarks listed on Schedule 1.1(g), all fictional business names, trade names, service marks, registered user entries, copyrights in both published works and unpublished works and all right, title and interest of the Sellers in any application for any of the foregoing, and all claims and causes of action relating to any of the foregoing, including claims and causes of action for past infringement as set forth on Schedule 1.1(g) (collectively, the "Intellectual Property Assets");

(h)      all the right, title and interest of the Sellers in, to and under all websites, domain names, email addresses and similar assets related to the operation of the Business;

(i)      all the right, title and interest of the Sellers in, to and under all telephone numbers, including all extensions thereto, used in the operation of the Business at each of the Locations;

(j)      subject to applicable laws and regulations, all transferable licenses, permits, certificates, franchises, approvals and other governmental or regulatory authorizations necessary for or incident to the ownership and operation of the Business at each of the Locations;

(k)      all accounts receivable and notes receivable of Sellers related to each of the Locations;

(l)      all goodwill of the Sellers relating to, attributable to or arising from the Assets or the Business at each of the Locations; and

(m)      rights under outstanding or prospective bids, proposals, offers, or similar items made by the Sellers to potential customers or contract parties ("Assumed Bids") listed on Schedule 1.1(m), and which Schedule 1.1(m) may include certain Assumed Bids relating to the Connecticut Location, as mutually agreed upon by the Parties (the "Connecticut Bids").

Section 1.2 Excluded Assets. Notwithstanding anything else contained herein, the following assets are excluded from the Assets being acquired by or transferred to Buyer at the Closing (collectively, the "Excluded Assets"):

(a)      restricted and unrestricted cash and cash equivalents, including cash, cash accounts, insurance policies or programs, marketable securities, certificates of deposit, deposits made with

3

respect to the Excluded Contracts or other Excluded Assets, and utility deposits (the "Retained Cash Equivalents");

(b)     all inventory not owned by a Seller or that is disposed of or exhausted prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by a Seller;

(c)     all items of personal property not owned by a Seller or that are transferred or disposed of prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by a Seller;

(d)     all assets, rights and funds in connection with any "employee benefit plans," as defined in § 3(3) of ERISA, all benefit plans as defined in § 6039D of the Code and the rules and regulations promulgated thereunder, and all other stock purchase, stock option, equity-based, retention bonus, bonus, incentive compensation, deferred compensation, profit sharing, severance, change in control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, welfare and other employee benefit plans (whether oral or written, qualified or non-qualified) and employment agreements, programs, policies or other arrangements and any trust, escrow or other funding arrangement related thereto ("Benefit Plans");

(e)     all rights (i) under any insurance policies of the Sellers, and any right to refunds due and/or cash surrender values with respect to such insurance policies, and (ii) under or pursuant to all warranties (express or implied), representations and guarantees made or provided by third parties relating to any Excluded Assets;

(f)     each Seller's corporate record books, minute books and tax records, and any other records which such Seller is required to retain by Law (copies of which may be given to Buyer), but only to the extent that such books and records cannot be transferred to Buyer if Buyer agrees to grant such Seller access to such books and records and to maintain them for the period required by Law.  For purposes of this Agreement, "Law" means any statute, rule, regulation, code, ordinance, resolution, Order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority, and "Governmental Authority" means the government of the United States and any government of a state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, any state of the United States or any political subdivision thereof, any tribunal or arbitrator(s) of competent jurisdiction and any self regulatory organization;

(g)     any right, title or interest of the Sellers in any Federal, state, local or foreign Tax refunds (and any income with respect thereto), Tax credits, Tax benefits, or other governmental charges.  For purposes of this Agreement, "Tax" means (i) any and all federal, state, local,

4

foreign and other net income, gross income, gross receipts, sales, use, ad valorem, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other tax, fee, assessment or charge of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (ii) any liability for payment of amounts described in clause (i) as a result of transferee liability or otherwise through operation of law, and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person, and "Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or government (whether federal, state, county, city or otherwise, including, without limitation, any instrumentality, division, agency or department thereof);

(h)     any and all of Seller's claims, demands, rights, defenses, counterclaims, suits or actions and all other claims of any value whatsoever of Sellers, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof ("Causes of Action") (other than Causes of Action (i) with respect to or arising out of any Assumed Contract; and (ii) arising with respect to property, plant or equipment included in the Assets, whether as a result of a warranty or otherwise (collectively, the "Assigned Causes of Action")), including, without limitation, any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of Sellers or the bankruptcy estate of Sellers under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of §§ 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code ("Avoidance Actions"), and Seller's claims or causes of action for breach of fiduciary duty, professional negligence or director and officer liability. For the avoidance of doubt, all claims of the Sellers against Zodiac US Corporation, Safran USA, Inc., or Safran, S.A., or their respective related parties shall be Excluded Assets;

(i)     any rights under this Agreement or any other document entered into with Buyer;

(j)     the Excluded Contracts;

(k)     subject to Section 1.4(b), any contract or permit not assignable by its terms;

(l)     the Carved-Out Assets (as defined herein), if any;

(m)     assets on site at Sellers' leased locations located in Bloomfield, Connecticut (the "Connecticut Location"), except for those Connecticut Contracts and Connecticut Bids, which will transfer to Buyer as provided above;  and

(n)     any other item set forth on Schedule 1.2 attached hereto and made a part hereof.

**Section 1.3 Assumption of Liabilities**.

(a)     Except as set forth on Schedule 1.3, which Schedule 1.3 will be mutually agreed to by the Parties and appended to this Agreement prior to Closing , or otherwise set forth in this Agreement, Buyer will not assume any debts, liabilities, obligations, expenses, taxes, contracts or

5

commitments of the Sellers of any kind, character or description, whether accrued, absolute, contingent or otherwise, no matter whether arising before or after the Closing, and whether or not reflected or reserved against in the financial statements, books of accounts or records of the Sellers. With the exception of those items as specifically set forth on Schedule 1.3 attached hereto, Sellers will retain all liabilities directly or indirectly arising out of or related to the ownership and operation of the Assets and the Business before or on the date of the Closing, and directly or indirectly arising out of or related to the ownership and operation of the Excluded Assets before, on or after the Closing. The liabilities and obligations set forth in this Section, including any and all liabilities of Sellers in connection with any Assumed Contract or Assumed Bid with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Amounts, and on Schedule 1.3 are herein referred to as the "Assumed Liabilities." For purposes of this Agreement, (i) "Cure Amounts" means the amounts determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults on the part of the Sellers under any of the Assumed Contracts as required by Section 365(b)(1) of the Bankruptcy Code, and (ii) "Final Order" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, re-argument, rehearing, reconsideration or certiorari has been taken and, unless otherwise agreed by the Buyer, is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

(b)     Notwithstanding the foregoing, if the Assets include personal property located at the Milton Location or the Mississippi Location, the Parties acknowledge and agree that the Buyer shall be responsible for any fees, costs, and liabilities associated with the post-Closing occupancy of any Assets at the Milton Location and the Mississippi Location, if any, and the fees, costs, and liabilities associated with both the removal of any Assets from the Milton Location and the Mississippi Location, if any, and their delivery to Buyer, if necessary. For purposes of this Agreement, the aforementioned fees, costs and liabilities shall be considered Assumed Liabilities. Any post-Closing occupancy or removal fees, costs, and liabilities at the Milton Location or the Mississippi Location, as applicable, solely attributable to Excluded Assets shall not be Assumed Liabilities.

(c)     Buyer agrees to assume any and all existing warranty obligations given by either Seller to its customers before the Closing and to honor such warranties following the Closing, without recourse or indemnity to such Seller.  Such warranty obligations shall be Assumed Liabilities.

**Section 1.4 Assignment of Contracts**.

(a)     Anything in this Agreement to the contrary notwithstanding, except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, this Agreement shall not constitute an agreement to assign, and the Assets shall not include, any claim, contract, instrument,

agreement, license, lease, commitment, sales order, purchase order or any claim or right, or any benefit arising thereunder or resulting therefrom, if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way affect the rights of Buyer or Sellers thereunder. As necessary, each Seller will use its good faith efforts to obtain the consent of any and all third parties to the assignment of any such Assumed Contract or agreement prior to the Closing. Except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, if such consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect such rights, each Seller will cooperate with Buyer (but shall not be obligated to incur any expenses in such efforts) in any arrangement designed to provide for Buyer the benefits under any such claims, contracts, instruments, agreements, licenses, leases, commitments, sales orders or purchase orders, including, without limitation, enforcement for the benefit of Buyer of any and all rights of Buyer or the Sellers against a third party thereto arising out of a breach or cancellation by such third party or otherwise; and any transfer or assignment to Buyer of any property or property rights or any contract or agreement which shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained, or as provided otherwise in the Sale Order.

(b)        Each Seller agrees to provide such cooperation (but shall not be obligated to incur any expenses in such efforts) as reasonably necessary to enable Buyer to request consents, waivers, registrations, or novation for any Contracts which are not subject to assumption and assignment under the terms of the applicable Contract or by virtue of applicable law without the consent or approval of the counterparty to the Contract. For the avoidance of doubt, Buyer obtaining approval of such consents, waivers, registrations, or novations shall not be a condition to Closing.  Without limiting the generality of the foregoing, Sellers shall cooperate, support and assist Buyer in having any Government Contract that is an Assumed Contract assigned and/or novated to Buyer (but shall not be obligated to incur any expenses in such efforts). For purposes of this Agreement, a "Government Contract" means any contract or agreement between a Seller and any Governmental Authority (as defined in this Agreement) that is open and has not yet been (and will not be at the Closing) completely performed.

## ARTICLE 2
## CONSIDERATION

**Section 2.1 Purchase Price**.

(a)        In consideration of and in full payment for the purchase of the Business and the Assets and subject to the provisions of this Agreement, Buyer shall pay to Sellers the sum of Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00) (the "Purchase Price").

(b)        Buyer shall pay a deposit in an amount equal to Two Hundred Twenty Five Thousand and 00/100 Dollars ($225,000.00) (the "Buyer Deposit") to Stichter, Riedel, Blain & Postler, P.A. (the "Escrow Agent") upon the full execution of this Agreement. The Buyer Deposit shall not become property of the Debtors' bankruptcy estates until immediately after Closing of the sale to Buyer. If the transaction contemplated hereunder is consummated in accordance with the terms hereof, the Buyer Deposit shall be credited to the Purchase Price. If Buyer is not the Successful Bidder, as defined herein, the Buyer Deposit, without interest, shall be repaid or

returned to Buyer immediately upon the closing of an alternative transaction approved at the Sale Hearing, as defined herein.

(c)    At the Closing, Buyer shall pay to the Escrow Agent, by wire transfer of good and immediately available funds, the Purchase Price <u>plus</u> the Closing Costs (as defined herein) <u>less</u> the Buyer Deposit <u>less</u> the value of the Carved-Out Assets, if any, as set forth on the Purchase Price Allocation (as defined herein).

## ARTICLE 3
## CLOSING; OBLIGATIONS OF THE PARTIES

**Section 3.1 Closing**. The closing (the "<u>Closing</u>") will take place remotely via the exchange of documents and signatures, at such place and time as may be mutually agreed upon by the parties no later than five (5) business days after all conditions set forth in Article 8 are satisfied, or at such other time and place as the parties mutually agree upon, orally or in writing (the "<u>Closing Date</u>").

**Section 3.2 Obligations of the Parties at the Closing**.

(a)    At the Closing, Buyer shall deliver to Escrow Agent (or the Sellers' agent or such other party(s) as may be designated in writing by the Sellers):

(i)    after taking into account the Buyer Deposit on hand with the Escrow Agent and after deducting from the Purchase Price the value of the Carved-Out Assets, if any, as set forth on the Purchase Price Allocation, an amount in immediately available funds equal to Purchase Price <u>plus</u> the Closing Costs (collectively, the "<u>Cash Payment</u>");

(ii)    executed counterparts to such bills of sale, assignments, intellectual property assignment, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as shall be effective to vest in Buyer all of the title to and interest of the Sellers in the Assets (collectively, the "<u>Transaction Documents</u>");

(iii)    copies of resolutions duly adopted by the board of directors / manager(s) of Buyer (as applicable) authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing by an appropriate officer of Buyer;

(iv)    certificates of existence and good standing for Buyer, certified by the Secretary of State of Florida, dated within ten (10) business days of the Closing; and

(v)    such other certificates and documents as the Sellers or their counsel may reasonably request.

(b)    At the Closing, the Sellers will deliver to Buyer:

(i)    the Sale Order, which shall be a Final Order, as defined herein, and shall release all Encumbrances, except as set forth in the Sale Order, encumbering any of the Assets, and which shall be in the form <u>and substance acceptable to Buyer in its sole discretion</u>;

4892-5980-3269, v. 9

(ii)     the Transaction Documents; and

(iii)    such other documents as Buyer or its counsel may reasonably request.

**Section 3.3  <u>As Is</u>.**  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE ASSETS "AS IS" AND "WHERE IS," "WITHOUT RECOURSE," AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT SELLERS ARE MAKING NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE QUALITY, PHYSICAL CONDITION, EXISTENCE, LOCATION, OR VALUE OF THE ASSETS, OR THE INCOME OR EXPENSES FROM OR OF THE BUSINESS OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS, THE USE RESTRICTIONS AFFECTING THE ASSETS, THE ENFORCEABILITY OF ANY CONTRACT OR OTHER AGREEMENT OR RIGHT ASSIGNED HEREUNDER, OR THE COMPLIANCE OF THE ASSETS OR ANY PART THEREOF WITH ANY LAWS, STATUTES, RULES, ORDINANCES, DECREES OR ORDERS APPLICABLE THERETO. WITHOUT LIMITING THE FOREGOING, IT IS UNDERSTOOD AND AGREED THAT SELLERS MAKE NO WARRANTY OF HABITABILITY, SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE.

Buyer acknowledges that Buyer is purchasing the Assets based solely upon Buyer's own independent investigations and findings and not in reliance upon any information provided by Sellers or Sellers' agents or representatives.  Sellers shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Assets, furnished by any agent, employee, or other person representing or purporting to represent Sellers. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**Section 3.4.  Delivery of Assets**.  At the Closing:

(a)     Sellers shall deliver or cause to be delivered to Buyer duly executed instruments of transfer and assignment in form and substance satisfactory to Buyer and its attorneys, sufficient to vest in Buyer good title to, and all the right, title and interest of Sellers in and to, the Assets, free and clear of all liens, pledges, charges, security interests, claims, options, imperfections of title, tenancies, or other rights, interests or encumbrances of any kind or nature (collectively, "<u>Encumbrances</u>," and each, an "<u>Encumbrance</u>"), except for the Assumed Liabilities.

(b)     Each Seller and Buyer shall execute and deliver, or cause to be executed and delivered, such other certificates, documents and instruments as are set forth in Article 3 hereof.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As of the date hereof and as of the Closing Date, Sellers represent and warrant to Buyer, on a joint and several basis, the following:

9

**Section 4.1 Corporate Capacity**.  Pioneer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Strong is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Subject to and by virtue of the entry of the Sale Order, each Seller has the requisite power and authority to enter into this Agreement and the Transaction Documents and perform its obligations thereunder.

**Section 4.2 Corporate Powers.**  Subject to and by virtue of the entry of the Sale Order, each Seller's execution, delivery and performance of this Agreement and all other agreements referenced herein or ancillary hereto to which it is a party, and each Seller's consummation of the transactions contemplated hereby or thereby are within such Seller's corporate powers and are not in contravention of the terms of its articles of incorporation and bylaws, and have been approved by all requisite corporate action.

**Section 4.3 Title to Assets**.  Subject to the entry of the Sale Order, upon the sale, assignment, transfer and delivery of the Assets to the Buyer under this Agreement and the related sale documents, there will be vested in the Buyer good, marketable and indefeasible title to the Assets, free and clear of all Encumbrances except as set forth in the Sale Order.  Sellers represent, warrant, covenant, and agree that, in the exercise of their good faith efforts, the Seller Data transferred and sold as part of the Assets has been segregated from other data of the Sellers, will be sold and made available exclusively to Buyer, and will not be sold or made available to any other purchaser of the properties or assets of the Sellers (including with respect to the Connecticut Location).

**Section 4.4 Binding Agreement.**  Subject to the entry of the Sale Order, this Agreement has been and, on the Closing Date, all of the agreements and documents to which each Seller shall be a party in connection with this Agreement shall have been, duly executed and delivered by such Seller, and shall be the valid and legally binding obligation of such Seller, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 4.5 Legal Proceedings.** Except as disclosed in the Sellers' Bankruptcy Schedules, otherwise known to the Buyer or as set forth on <u>Schedule 4.5</u> attached hereto, there is no arbitration, audit, hearing, investigation, litigation suit or other similar action by or before a Governmental Authority (each a "<u>Proceeding</u>") or any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority (each an "<u>Order</u>") pending or, to the knowledge of Sellers, threatened against or affecting either Seller or any of its properties or rights.  Each Seller expressly represents and warrants that, to its knowledge, there are no Procedings or Orders currently pending that challenge or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with or increasing the costs of any of the transactions contemplated by this Agreement.  To the knowledge of each Seller, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 4.6 Brokers and Finders.**  With the exception of the engagement of the Sellers' financial advisor, payment for which will come solely from Sellers or an Affiliate, neither Sellers nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.  For purposes of this Agreement, "Affiliate" means, with respect to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venture or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES BY BUYER

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Sellers the following:

**Section 5.1 Corporate Capacity.**  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has the requisite power and authority to enter into this Agreement and the Transaction Documents, perform its obligations hereunder and to conduct its businesses as now being conducted.

**Section 5.2 Corporate  Powers; Consents; Absence of Conflicts With Other Agreements.**  Buyer's execution, delivery and performance of this Agreement and all other agreements referenced in or ancillary hereto to which Buyer is a party, and Buyer's consummation of the transactions contemplated hereby or thereby:

(a)     are within Buyer's corporate powers and are not in contravention of the terms of Buyer's articles of incorpoation or bylaws and have been approved by all requisite corporate action;

(b)     has been or will be approved by or consented to by any Governmental Authority which is required by Law or the regulations of any Governmental Authority;

(c)     shall not violate any Law to which Buyer may be subject;

(d)     shall not violate any order of any court or Governmental Authority to which Buyer may be subject;

(e)     shall not render Buyer insolvent or otherwise unable to pay its debts as they become due; and

(f)     are not subject to any financing contingencies.

11

**Section 5.3 Binding Agreement.**  Subject to the entry of the Sale Order, this Agreement has been and, at the Effective Time, all of the agreements and documents to which Buyer is a party in connection with this Agreement shall have been duly executed and delivered by Buyer, and shall be the valid and legally binding obligation of Buyer, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 5.4 Legal Proceedings.** There is no Proceeding or Order pending or, to the knowledge of Buyer, threatened against or affecting Buyer or any of its properties or rights that challenges or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with any of the transactions contemplated by this Agreement. To the knowledge of Buyer, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 5.5 Brokers and Finders.**  Neither Buyer nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.

## ARTICLE 6
## COVENANTS AND AGREEMENTS OF THE SELLERS

**Section 6.1 Bankruptcy Court Approval.**

(a)    No later than five (5) business days following the execution and delivery of this Agreement, Sellers shall file a motion (the "Sale Motion") with the Bankruptcy Court, inform and substance acceptable to Buyer in its sole and absolute discretion, seeking the entry of an order, in form and substance acceptable to Buyer in its sole and absolute discretion and in substantially the form attached hereto as Exhibit "A", approving the sale of the Assets to Buyer and the Transaction pursuant to the terms and conditions of this Agreement, subject to higher and better bids, and approving certain bid procedures and bid protections in connection with the sale of the Assets (the "Sale Procedure Order").

(b)    The Sale Procedure Order shall prescribe the procedures that shall govern an auction sale of the Assets (the "Auction"), including but not limited to (i) approving this Agreement as an approved stalking horse bid; (ii) establishing the date of the Auction (the "Auction Date") and the location of the Auction; (iii) a requirement that in order to be qualified to bid on the Assets at the Auction, prospective bidders must deposit the cash amount of not less than the greater of (i) ten percent (10%) of the Initial Upset Bid, as defined herein, or (ii) Two Hundred Thousand and 00/100 Dollars ($200,000.00), with Escrow Agent as an earnest money deposit (the "Bidder's Deposit") and submit a signed asset purchase agreement in substantially the same form as this Agreement (black-lined to show the changes against this Agreement), in each case by no later than 5:00 p.m. (Eastern Prevailing Time) on the date that is two (2) business days prior to the Auction Date (the "Bid Deadline"); (iv) the nature of the financial information that prospective bidders must submit to establish their financial capacity to consummate a successful bid for the Assets (in at least the amount of the Initial Upset Bid, as defined herein), which shall be delivered

by no later than the Bid Deadline; (v) the nature of the notice of the Auction and the Sale Motion that must be disseminated to creditors of the Sellers, parties in interest in the Bankruptcy Case, and potential interested prospective bidders; (vi) the minimum upset bid required to start the auction sale which in any event shall be no less than $250,000.00 above the Purchase Price (the "Initial Upset Bid"); (vii) in the event Buyer is not the successful bidder at the Auction for all (and not less than all) of the Assets proposed to be purchased by Buyer hereunder (such successful bidder, the "Successful Bidder"), (i) the reimbursement and payment by the Successful Bidder to Buyer for its reasonable expenses incurred for due diligence, contract negotiation and contract preparation, in the amount of $75,000.00 (the "Expense Reimbursement"), and (ii) providing for the rights of Buyer in the event of any Carved-Out Assets, consistent with Section 6.1(c) of this Agreement; (viii) following an Initial Upset Bid, the incremental amount by which each bid must exceed the prior bid, which amount shall be $100,000.00 (the "Overbid Amount"); (ix) setting the date for the hearing to be held by the Bankruptcy Court on the Sale Motion (the "Sale Hearing"); (x) setting the deadline for the filing with the Bankruptcy Court of objections to the Sale Motion, which shall be two (2) business days prior to the Auction Date; (xi) setting procedures for the assumption and assignment of the Assumed Contracts and for asserting Cure Claims; and (xii) such other procedures as requested by the Sellers and approved by the Bankruptcy Court as reasonable under the circumstances of the Bankruptcy Case (and as acceptable to Buyer in its sole and absolute discretion).

(c)     Notwithstanding the foregoing or anything else contained in this Agreement, if any bids for all of the Assets located at or related to any Location(s) are deemed by the applicable Seller to be higher and better bids for those Assets than those as contemplated in this Agreement and valued by the Buyer as set forth in the Purchase Price Allocation (subject to adjustment as provided below), then, subject to the bidding rights of such bidder(s) and the Buyer at the Auction and the outcome of the Auction and the Sale Hearing, such Seller(s) may proceed to a closing of the sale of the Assets located at or related to such Location(s) (the "Carved-Out Assets") to the winning bidder and the Purchase Price shall be reduced by the value of the Carved-Out Assets as set forth on the Purchase Price Allocation. The Carved-Out Assets shall be Excluded Assets. Notwithstanding any of the foregoing to the contrary, exclusion of the Carved-Out Assets will be subject to the following additional terms and conditions:

(i)     In the event that Carved-Out Assets are excluded from the Transaction, Buyer will be entitled to a prorated return of the Buyer Deposit, as well as payment of a prorated portion of the Expense Reimbursement, which such proration to be made in each case based upon the Purchase Price Allocation.

(ii)    Buyer shall retain the right and option to adjust the Purchase Price Allocation at the Auction in order to respond to competitive bids that may be submitted at the Auction for discreet Assets, or portions thereof.

(iii)   In the event that the value of the Carve-Out Assets exceeds 40% of the value of the total Assets (as determined under the Purchase Price Allocation), Buyer will have the right and option (but not the obligation) to terminate this Agreement, including Buyer's obligation to proceed to Closing on the Transaction.  For clarification, upon termination of this Agreement pursuant to this Section 6.1(c)(iii), Buyer will be entitled to the full $75,000 Expense Reimbursement (without any proration).

(d)    Each Seller agrees to assume in the Bankruptcy Case and assign to the Buyer any Assumed Contract to which such Seller is a party.  Assumption and assignment of the Assumed Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the applicable Seller has rights or licenses granted in connection with or under the Assumed Contracts, so long as such ancillary or related agreements do not create additional obligations of the Sellers or the Buyer beyond those set out in the Assumed Contracts (unless the Buyer subsequently agrees to such obligations). The Buyer shall be responsible for and shall pay all Cure Amounts in connection with the assumption and assignment of any Assumed Contract to the Buyer.  Pursuant to Section 365 of the Bankruptcy Code and the Sale Procedures Order, and as requested by parties to the Assumed Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Assumed Contracts. Buyer shall have the right to add or remove any executory contract or unexpired lease from the list of Assumed Contracts until the Closing Date. After the Closing Date, the Debtor shall be released from any further Liability under the Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

Section 6.2 Access; Further Assurances. From and after the Effective Date, Buyer and its representatives and agents will have the right to access the premises of the Sellers during regular business hours to review, inspect and copy any and all books, records, documents or other information concerning the Assets or the operation of the Business as Buyer or its representatives or agents may reasonably request and subject to the terms of the existing confidentiality agreement in place between the Sellers and the Buyer (the "Confidentiality Agreement"). At any time and from time to time after the Closing, at Buyer's request and without further consideration, each Seller will execute and deliver such other instruments of sale, transfer, conveyance, assignment, and delivery and confirmation and take such action as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer and to place Buyer in possession and control of, and to confirm Buyer's title to, the Assets, and to assist Buyer in exercising all rights and enjoying all benefits with respect thereto.

Section 6.3 Confidentiality Covenant. Following the Closing Date, no Seller will, directly or indirectly, use for any purpose or disclose to any third party, any trade secret, supplier or patient list, financial data, price list, pricing or marketing policy or plan, financial information, prices, costs, treatment methods, strategic planning information, processes, plans, methods of doing business or any other proprietary or confidential information that is the property of Buyer (or of any of its Affiliates). This restriction will not apply to any information that (i) is or becomes generally available to and known by the public (other than as a result of unpermitted disclosure directly or indirectly by a Seller or such Seller's Affiliates, advisors or representatives); (ii) is or becomes available to such Seller on a non-confidential basis from a source other than Buyer or its Affiliates, advisors or representatives, provided that, at the time of disclosure to such Seller, such source was not bound by a confidentiality agreement with or other obligation of secrecy to Buyer or any of its Affiliates; or (iii) has already been or is hereafter independently acquired or developed by such Seller without violating any confidentiality agreement with or other obligation of secrecy to Buyer.

# ARTICLE 7
## COVENANTS AND AGREEMENTS OF BUYER

14

**Section 7.1 Taxes**. Buyer will be responsible for, and hereby agrees to assume and pay, all sales and use or similar taxes that may be due to any jurisdiction or governmental body as a result of the sale and transfer of the Assets. Each Seller shall be responsible for its own income or capital gains taxes as a result of this Agreement and the transactions related thereto.

**Section 7.2 Confidentiality**. Buyer shall, and shall use its reasonable best efforts to cause its employees, representatives and agents to, hold in confidence, as if it were confidential information of Buyer, all information of any kind concerning Sellers or the Business, obtained directly or indirectly from a Seller or its Affiliates in connection with the transactions contemplated by this Agreement except information (a) ascertainable or obtained from public or published information, (b) received from a third party not known by Buyer to be under an obligation to Sellers to keep such information confidential, (c) which is or becomes known to the public (other than through a breach of this Agreement), or (d) which was in Buyer's possession prior to disclosure thereof to Buyer in connection herewith (the "Confidential Information"), unless compelled to disclose such information by judicial or administrative process or, in the opinion of counsel, by other legal requirements, and Buyer shall not disclose Confidential Information to any Person, except as otherwise may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer. Notwithstanding anything contained herein or in the Confidentiality Agreement to the contrary, Buyer is permitted to share or disclose Sellers' due diligence and other Confidential Information with its employees, contractors, personnel, representatives, financing sources, attorneys, and other professional advisors, as may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer. If this Agreement is terminated, then upon Sellers' written request, Buyer shall within twenty (20) days return or cause to be returned to Sellers all documents and all copies thereof furnished by Sellers and held by Buyer, its representatives or agents containing such Confidential Information. Buyer recognizes that any breach of this Section would result in irreparable harm to Sellers and that therefore Sellers shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies.

**Section 7.3 Employment**. As of the Effective Time, each Seller shall terminate all of its employees and the Buyer shall offer employment effective as of the Effective Time to such employees of each such Seller that Buyer elects and determines to offer employment to, on terms and conditions determined by the Buyer in its sole and absolute discretion. Such employees who accept the Buyer's offer of employment shall be referred to herein as the "Hired Employees". To facilitate the Buyer's determination of which employees to whom Buyer desires to offer employment as a Hired Employee, each Seller shall provide the Buyer, within a reasonable period prior to the Closing, a true and correct list of all of its employees, including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment. With respect to the Hired Employees, after the Effective Time, the Buyer shall be responsible for all liabilities, obligations and commitments of the Buyer and its Affiliates relating to all wages, salaries, bonuses, vacation, sick leave and other forms of compensation and related expenses, workers' compensation claims, and employee benefit liabilities under any and all plans, programs and arrangements maintained or contributed to by the Buyer and its Affiliates for the benefit of the Hired Employees, if and to the extent incurred or accrued after the Effective Time. The Sellers shall have no responsibility whatsoever for any

15

liabilities or obligations that relate in any way to such Hired Employees' employment with the Buyer or any subsequent termination of employment of any Hired Employee by the Buyer. Buyer shall not assume, and shall have no responsibility whatsoever for, any liabilities or obligations that relate in any way to such Hired Employees' employment with the Sellers prior to the Effective Time, including any liabilities or obligations related to the termination of employment of such Hired Employees by the Sellers.

**ARTICLE 8**
**CONDITIONS TO CLOSING**

**Section 8.1 Conditions to Buyer's Obligations.** All obligations of Buyer hereunder are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties made by the Sellers in this Agreement and the statements contained on the Schedules attached hereto or in any instrument, list, certificate or writing delivered by the Sellers pursuant to this Agreement shall be true in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)    <u>Sale Procedure Order</u>. Entry by the Bankruptcy Court of the Sale Procedure Order, in the form and substance acceptable to Buyer in its sole and absolute discretion and in substantially the form attached hereto as <u>Exhibit "A"</u>, expressly approving and authorizing bid procedures and including a provision that if Buyer is not the Successful Bidder at the Auction sale, then (i) the Sellers shall pay to Buyer upon Bankruptcy Court approval of a bid of another entity as shall be determined by the Bankruptcy Court to be "a higher and better bid" for the Assets (with the express exception of the Carved-Out Assets, if any) than that of Buyer (the "<u>Higher Auction Transaction</u>") and the closing of the Higher Auction Transaction, the Buyer Deposit, and (ii) the Successful Bidder shall pay to Buyer upon Bankruptcy Court approval of the Higher Auction Transaction and the closing of the Higher Auction Transaction, the Expense Reimbursement. Payment of the Expense Reimbursement, and the Buyer Deposit shall be the sole remedy of Buyer for the failure of Sellers to complete the sale of the Assets (with the express exception of the Carved-Out Assets, if any, which will be subject to the Expense Reimbursement (prorated or otherwise), as provided above) to Buyer as a result of a Higher Auction Transaction.

(c)    <u>Sale Order</u>. Entry by the Bankruptcy Court of the Sale Order in the form and substance acceptable to Buyer in its sole discretion, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and the Sale Order shall be a Final Order. For clarification, Buyer's obligation to close on the Transaction shall in all cases be subject to and contingent upon Buyer being named the Successful Bidder for the Assets (with the express exception of the Carved-Out Assets, if any).

(d)    <u>Performance by the Sellers</u>. Each Seller shall have performed and complied in all material respects with all covenants, agreements, obligations and conditions required by this Agreement, and any exhibits thereto, including, but not limited to, the execution and delivery of the documents listed in Section 3.2(a)(ii) to the satisfaction of Buyer.

16

**Section 8.2 Conditions to Seller's Obligations**.  All obligations of the Sellers under this Agreement are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

(a)     <u>Representations and Warranties</u>. The representations and warranties made by Buyer in this Agreement and the statements contained in any instrument, list, certificate or writing delivered by the Buyer pursuant to this Agreement shall be true in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)     <u>Purchase Price</u>.  Buyer shall have delivered the Cash Payment to the Escrow Agent or other parties as directed by Sellers.

(c)     <u>Performance</u>. Buyer shall have performed and complied in all material respects with all agreements, obligations and conditions required by this Agreement and any exhibits thereto, to be so complied with or performed including payment and delivery of the Purchase Price and the execution and delivery of the documents listed in Section 3.2(a)(ii) to the satisfaction of Sellers.

(d)     <u>Litigation</u>. On the date of the Closing, there shall be no lawsuits pending against Buyer seeking to enjoin, prohibit, restrain or otherwise prevent the transactions contemplated hereby.

## ARTICLE 9
## SURVIVAL OF REPRESENTATIONS, WARRANTIES
## AND AGREEMENTS; EXPENSES

**Section 9.1 Survival**.  All representations and warranties of Sellers and Buyer contained in this Agreement and the Transaction Documents shall survive until and expire at the Closing.

**Section 9.2 Expenses**.

(a)     Whether or not the transactions contemplated by this Agreement are consummated, each party hereto shall pay all of such party's own fees and expenses incident to the negotiation, preparation and execution of this Agreement, including the fees and expenses of such party's own legal counsel, accountants and other advisors.  Sellers shall also remain solely responsible for the fees and expenses of Sellers' financial advisor.

(b)     Buyer shall be responsible for all costs and expenses due to any third parties and associated with the Closing (the "<u>Closing Costs</u>"), including, without limitation: (i) to the extent applicable, any and all sales or other transfer, stamp or similar taxes incurred in connection with the sale, transfer and assignment of the Assets and from Sellers to Buyer, (ii) any financing related expenses, and (iii) any other costs and fees incurred in connection with the sale, transfer and assignment of the Assets and from Sellers to Buyer hereunder at Closing or otherwise. For clarification, Closing Costs will exclude fees and expenses for which Sellers are responsible under Section 9.2(a).

4892-5980-3269, v. 9

# ARTICLE 10
# TERMINATION

      Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated at any time: (a) on or prior to the Closing Date by mutual written consent of Buyer and Sellers; (b) by Buyer, effective upon written notice to Sellers, if any of the conditions specified in Section 8.1 of this Agreement to the Buyer's obligation to close has not been satisfied and shall not have been waived by Buyer prior to or at the Closing; (c) by Sellers, effective upon written notice to Buyer, if any of the conditions specified in Section 8.2 of this Agreement to the Sellers' obligations to close has not been satisfied and shall not have been waived by Sellers prior to or at the Closing; (d) by Sellers, if Sellers accept and the Bankruptcy Court approves a Higher Auction Transaction for the Assets (with the express exception of the Carved-Out Assets, if any, which will be subject to a return to Buyer of a prorated portion of the Buyer Deposit, as provided above); (e) by Sellers, as provided in Section 6.1(c)(iii) above; or (f) by either party hereto, effective upon written notice to the other, if the Sale Procedure Order is not entered by the Bankruptcy Court in the Bankruptcy Case on or before the later of (i) the date that is fourteen (14) days after the filing of the Sale Motion and (ii) November 3, 2023. Further, the Buyer Deposit shall only be repayable or refundable to Buyer if (i) a Higher Auction Transaction (with the express exception of a Higher Auction Transaction as to the Carved-Out Assets, if any, which will be subject to a return to Buyer of a prorated portion of the Buyer Deposit and the Expense Reimbursement (prorated or otherwise), as provided above) closes pursuant to Section 8.1(b) of this Agreement; or (ii) even if a Higher Auction Transaction does not close, if the Agreement is terminated pursuant to (a), (b), (e) or (f) above (in which case Sellers will cause such Buyer Deposit to be refunded to Buyer no later than five (5) business days following any such termination of this Agreement pursuant to (a), (b), (e) or (f) above). For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Article 10, as well as Buyer's right to receive a return of the Buyer Deposit and Expense Reimbursement), Sellers retain the right to pursue any transaction or restructuring strategy that, in the Sellers' business judgment, will maximize the value of their estates in the Bankruptcy Case.

# ARTICLE 11
# MISCELLANEOUS

**Section 11.1 Assignability; Parties in Interest**.

      (a)    Subject to the terms of this section, Buyer may assign any or all of its rights under this Agreement to any direct or indirect subsidiary of Buyer. Buyer shall first advise the Sellers in writing of any such assignment and shall designate such party as the assignee and transferee of the Assets purchased under this Agreement. Any such assignee shall have ability to perform all of Buyer's duties and obligations under this Agreement and shall assume all of Buyer's duties, obligations and undertakings hereunder. Notwithstanding any such assignment, Buyer also shall remain liable hereunder for all of Buyer's duties and obligations under this Agreement.

      (b)    No Seller may assign, transfer or otherwise dispose of any of its respective rights hereunder without the prior written consent of Buyer.

(c)     All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors and permitted assigns, provided that the rights and obligations under all licenses of trademarks being assigned hereunder shall under no circumstances be assignable.

**Section 11.2 Allocation of Purchase Price**. Buyer and Sellers agree that the Purchase Price shall be allocated among the Assets of Sellers in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder. Attached hereto as <u>Exhibit "B"</u> is the proposed allocation of the Purchase Price, itemized by Seller, Asset, and Location, as determined by Buyer as of the Effective Date (the "<u>Purchase Price Allocation</u>"). Prior to the Closing, the Purchase Price Allocation shall be finalized by Buyer and Sellers, and, absent agreement of the Buyer and Sellers, shall be determined by the Bankruptcy Court. Such allocation shall be binding upon Buyer and Sellers, and Buyer and Sellers shall report the transactions contemplated hereby on all tax returns, including, but not limited to Form 8594. If it becomes necessary or appropriate to amend the allocation and any tax returns which incorporate such allocation, Buyer and Sellers shall cooperate with each other in good faith to agree on an amendment to such allocation and shall file any necessary amendments to tax returns to reflect such amendment. If, contrary to the intent of the parties hereto as expressed in this Section 11.2, any taxing authority makes or proposes an allocation different from the allocation determined under this Section 11.2, Buyer and Sellers shall cooperate with each other in good faith to contest such taxing authority's allocation (or proposed allocation); provided, however, that, after consultation with the party (or parties) adversely affected by such allocation (or proposed allocation), the party (or parties) hereto may file such protective claims to tax returns as may be reasonably required to protect its (or their) interests.  For clarification, Buyer shall reserve the right to adjust the Purchase Price Allocation as provided in Section 6.1(c)(ii) above.

**Section 11.3 Knowledge**. An individual will be deemed to have "knowledge" of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual could reasonably be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter. Buyer will be deemed to have "knowledge" of a particular fact or other matter if any individual who is currently serving as a director, officer or trustee of Buyer (or in any similar capacity) has, or at any time had, knowledge of such fact or other matter. Each Seller will be deemed to have "knowledge" of a particular fact or other matter if one or more of the following persons has knowledge of such fact or other matter: Mike Rinaldi, Charlie Hietala, or Allan Davis.

**Section 11.4 Entire Agreement; Amendments**. This Agreement, including the Schedules, lists and other documents and writings referred to herein or delivered pursuant hereto, which form a part hereof, contain the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants or undertakings other than those expressly set forth herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter. This Agreement may be amended only by a written instrument duly executed by all parties or their respective successors or permitted assigns. Any condition to a party's obligations hereunder may be waived but only by a written instrument signed by the party entitled to the benefits thereof. The failure or delay of any party at any time or times to require performance of any provision or to exercise its rights with

respect to any provision hereof, shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same.

**Section 11.5 Headings**. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

**Section 11.6 References**. References to a section or subsection when used without further attribution shall refer to the particular section or subsection of this Agreement.

**Section 11.7 Severability**. The invalidity of any term or terms of this Agreement shall not affect any other term of this Agreement, which shall remain in full force and effect.

**Section 11.8 Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including electronic mail, facsimile and telex) or when delivered by overnight courier, or five days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested to the following address:

|  |  |
|---|---|
| If to either or both Sellers: | Pioneer Aerospace Corporation |
|  | S.E., Inc. |
|  | Attn: Michael Rinaldi |
|  | 6448 Pinecastle Blvd., Suite 104 |
|  | Orlando, Florida  32809 |
|  | Email: Mike.Rinaldi@ASR-Pioneer.com |
|  |  |
|  | With Copy to Counsel: |
|  |  |
|  | Daniel R. Fogarty, Esq. |
|  | Stichter, Riedel, Blain & Postler, P.A. |
|  | 110 East Madison Street, Suite 200 |
|  | Tampa, Florida  33602 |
|  | Email: dfogarty@srbp.com |
|  |  |
| If to Escrow Agent: | Daniel R. Fogarty, Esq. |
|  | Stichter, Riedel, Blain & Postler, P.A. |
|  | 110 East Madison Street, Suite 200 |
|  | Tampa, Florida  33602 |
|  | Email: dfogarty@srbp.com |
|  |  |
| If to Buyer: | Paradigm Parachute and Defense, Inc. |
|  | 4040 Ashland Avenue |
|  | Pensacola, Florida 32534 |
|  | Attn:  Aaron Nazaruk, Chief Executive Officer |

20

Email: aaron.nazaruk@paradigmparachute.com

With Copy to Counsel:      Alexander Gorelik, Esq.
                           Taft Stettinius & Hollister LLP
                           200 Massachusetts Avenue, NW, Suite 500
                           Washington 20001-5875
                           Email: Agorelik@taftlaw.com

or to such other address as any party may have furnished to the others in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

**Section 11.9 Governing Law**. This Agreement, and any dispute, controversy or claim arising out of or relating to this Agreement or a breach thereof, shall be governed by and construed and enforced in accordance with the laws of the State of Florida without regard to its conflict of laws rules or principles that might refer the governance or the construction of this Agreement to the law of another jurisdiction. The prevailing party in any dispute arising out of this Agreement shall be entitled to its reasonable attorneys' fees and costs from the other party in addition to any other relief granted.

**Section 11.10 Waiver of Jury Trial.** EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW. ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.11 Counterparts**. This Agreement may be executed simultaneously in one or more counterparts, with the same effect as if the signatories executing the several counterparts had executed one counterpart, provided, however, that the several executed counterparts shall together have been signed by all parties to be bound hereby. This Agreement shall be binding upon each signatory hereto when one or more counterparts, as provided above, have been signed by Buyer and Sellers. All such executed counterparts shall together constitute one and the same instrument. Fax and electronic signatures (with originals to be delivered by a nationally recognized express mail service) shall have the same effect as original signatures for all purposes under this Agreement.

**Section 11.12 Publicity**. Buyer and Sellers will coordinate all publicity related to this Agreement and the activities contemplated hereunder and no party will issue any press release, publicity statement, or other written public notice relating thereto without the prior consent of the other.

**Section 11.13 Drafting.** No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Section 11.14 Time of Essence.** Time is of the essence in the performance of this Agreement.

21

4892-5980-3269, v. 9

     **Section 11.15 Further Assurances.** On and after the Closing Date, Buyer and Sellers will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including putting Buyer in possession of the Assets or to convey title to the Assets to Buyer.

     **Section 11.16 Exclusive Jurisdiction.** The parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto or any of a Seller's creditors or other parties in interest in the Bankruptcy Case affected hereby pertaining directly or indirectly to this Agreement or to any matter arising herefrom or related hereto; provided, however, that if the Bankruptcy Court determines that it lacks or abstains from exercising such jurisdiction the parties or creditors agree that the United States District Court for the Middle District of Florida, Orlando Division, shall have exclusive jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

22

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Sellers on the Effective Date first above written.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _Aaron Nazaruk_
    Aaron Nazaruk, Chief Executive Officer

**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: _____
Its: _____

S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: _____
Its: _____

23

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Sellers on the Effective Date first above written.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _____
    Aaron Nazaruk, Chief Executive Officer

**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: Mike Rinaldi
Its: President

S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: Mike Rinaldi
Its: President

23

## <u>INDEX TO EXHIBITS AND SCHEDULES</u>

Exhibit "A"          Form of Sale Procedure Order
Exhibit "B"          Purchase Price Allocation

Schedule 1.1(f)      Assumed Contracts
Schedule 1.1(g)      Intellectual Property Assets
Schedule 1.1(m)      Assumed Bids
Schedule 1.2         Other Excluded Assets
Schedule 1.3         Assumed Liabilities
Schedule 4.5         Legal Proceedings

4892-5980-3269, v. 9

**Exhibit "A"**

**Form of Sale Procedure Order**

**<u>Exhibit "B"</u>**

**Purchase Price Allocation**

| | |
|---|---|
| Columbia Location | $200,000 |
| Milton Location | $1,200,000 |
| Orlando Location | $850,000 |

# EXHIBIT B

# PROPOSED FORM OF BID PROCEDURES ORDER

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11, Subchapter V

AVIATION SAFETY RESOURCES, INC.,                Case No. 6:23-bk-4639-GER
S.E., INC.,                                     Case No. 6:23-bk-4641-GER
PIONEER AEROSPACE CORPORATION                   Case No. 6:23-bk-4643-GER

        Debtors.                                *Jointly Administered under*
_____/                *Case No. 6:23-bk-4639-GER*

S.E., INC.,                                     Case No. 6:23-bk-4641-GER
PIONEER AEROSPACE CORPORATION                   Case No. 6:23-bk-4641-GER

        Applicable Debtors.
_____/

**ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR
ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF DEBTORS' ASSETS; (II)
APPROVING OVERBID AMOUNTS AND STALKING HORSE EXPENSE
REIMBURSEMENT; (III) APPROVING FORM AND MANNER OF NOTICE
OF BIDDING PROCEDURES; AND (IV) SETTING OBJECTION DEADLINES**

        THESE CASES came on for hearing before the Court on     , at     .m.  (the "**Hearing**"),

upon the Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures in

Connection with the Sale of Debtors' Assets; (II) Approving Overbid Amounts and Stalking Horse

Expense Reimbursement; (III) Approving Form and Manner of Notice of Bidding Procedures; and

(IV) Setting Objection Deadlines (Doc. No.  ) (the "**Motion**")[1].   In the Motion, the Debtors requested an emergency hearing for the Court to consider the entry of an order (i) approving bidding procedures in connection with the sale of substantially all of the business operating assets (the "**Assets**") of Pioneer Aerospace Corporation d/b/a ASR-Pioneer ("**Pioneer**") and S.E., Inc. d/b/a Strong Enterprises ("**Strong**" and together with Pioneer the "**Debtors**") located in Bloomfield, Connecticut (the "**Connecticut Location**"), Columbia, Mississippi (the "**Mississippi Location**"), Milton, Florida (the "**Milton Location**"), and Orlando, Florida (the "**Orlando Location**," and together with the Connecticut Location, the Mississippi Location, and the Milton Location, each a "**Location**" and, collectively, the "**Locations**"), as such Assets are more particularly described in the Stalking Horse Bid (as defined below), to Paradigm Parachute and Defense, Inc. or its designee (the "**Stalking Horse Bidder**") as to the Mississippi Location, the Milton Location, and the Orlando Location, and such other bidders as may qualify as a stalking horse bidder for the Connecticut Location, or to such other party submitting the highest and best offer for all or a portion of all or certain of the Assets at an auction, (ii) approving overbid amounts and an expense reimbursement for the Stalking Horse Bidder in connection with such sale, (iii) approving the form and manner of notice of the sale and the bidding procedures, (iv) setting deadlines for objections to the sale, and (v) establishing procedures for the assumption and/or assignment by the Debtors of certain executory contracts and unexpired leases to which either of the Debtors is a party.

No objections to the Motion were filed with the Court prior to the Hearing.

As stated in the Motion, the Debtors entered into an asset purchase agreement (the "**Stalking Horse APA**") with the Stalking Horse Bidder providing for the sale of the Assets as to

---

[1]     Unless otherwise defined herein, capitalized terms used in this Order shall have the same meaning ascribed to such terms in the Motion.

4863-6200-0773, v. 6

the Mississippi Location, the Milton Location, and the Orlando Location by the Debtors, the assumption of certain specified liabilities of the Debtors, and the assumption and assignment of certain leases and contracts, pursuant to 11 U.S.C. §§ 363 and 365, for a total transaction consideration of $2.25 million (consisting of cash consideration to the Debtors, not including the assumption of certain liabilities of the Debtors).  The Stalking Horse APA is attached as <u>Exhibit A</u> to the Motion.

The Court considered the Motion, together with the record and the arguments of counsel at the Hearing, and being otherwise duly advised in the premises, and for the reasons announced on the record at the Hearing, which shall constitute the order of the Court as if specifically provided herein, finds that the relief requested in the Motion is necessary and appropriate, that the Motion is well taken and shall be granted in accordance with the terms and conditions set forth herein, and that the Stalking Horse Bidder shall be selected as the "stalking horse bidder".  The Court further finds that it would be in the best interests of the Debtors, in consultation with the Subchapter V Trustee (the "**Consultation Party**"), their creditors, and their estates that an orderly procedure for the selection of the highest and best offer or offers for the sale of the Assets be established, which will create a fair and level playing field for all prospective bidders and represent the best method for maximizing the value of the Assets, either individually or collectively.  The Court thus finds that it is appropriate to provide other prospective purchasers with the opportunity to submit competing bids for the Assets, and that notice of the proposed sale of the Assets to the Stalking Horse Bidder shall be sent to all parties (collectively, the "**Bidder List**") that have expressed interest to, or have been in discussions with, the Debtors as to the potential opportunity to acquire the Assets, as well as to all creditors and parties in interest.  The Court also finds that it is appropriate to require any such prospective purchasers to comply with certain requirements in

connection with the submission of competing bids, and that the bidding procedures proposed by the Debtors, as set forth in the Motion and as modified at the Hearing and contained in this Order, are reasonable.  The Court further finds that it is appropriate under the circumstances to approve the Overbid Amounts (as defined below), the Stalking Horse Expense Reimbursement (as defined below), as set forth below.  The Court also finds that it is appropriate to establish deadlines for the filing and service of written objections to the sale of the Assets to any Qualified Bidder (as defined below).

The Court also finds that it is appropriate that notice of the proposed assumption and/or assignment by the Debtors to the Stalking Horse Bidder (or any other party that may be the Successful Bidder (as defined below) or the Backup Bidder (as defined below)) of any executory contracts and unexpired leases to which either of the Debtors is a party (collectively, the "**Assumed Contracts**") be sent to each lessor or other party to any Assumed Contract (collectively, the "**Contract Parties**") to be assumed and/or assigned to the Stalking Horse Bidder (or any other party that may be the Successful Bidder or the Backup Bidder) in accordance with the provisions of this Order.  The Court finds that it is also appropriate to require the establishment of a deadline for the filing and service by the Contract Parties of written objections to, and/or the assertion of any cure claims, defaults, or any other claims against the Debtors in connection with, the proposed assumption and/or assignment of any Assumed Contract to the Stalking Horse Bidder (or any other party that may be the Successful Bidder or the Backup Bidder).

The Court finds that notice of the Motion and the relief sought therein and the notice of the Hearing to creditors and other parties in interest was sufficient under the circumstances, that such notice complied with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court, and that the parties have proceeded in good faith. Accordingly, it is

**ORDERED**:

1.      The Motion is GRANTED to the extent set forth herein below.

2.      All objections to the Motion raised on the record at the Hearing that were not consensually resolved at the Hearing are hereby overruled.

3.      The Debtors shall, within five (5) business days following the date of entry of this Order, mail a copy of this Order and the Sale Motion (to the extent not already served), by United States first class mail, to (i) all parties and creditors on the Court's mailing matrices for these cases (including all parties listed on the Local Rule 1007-2 Parties in Interest List for these cases), (ii) all parties which, to the knowledge of the Debtors, have, or have asserted, liens on the Assets, (iii) all parties on the Bidder List, and (iv) all Contract Parties.  The Debtors shall thereafter file a certificate of service with the Court.  The Court approves the form and manner of such notice as being adequate and sufficient notice of the Bid Procedures (as defined below), the proposed sale of the Assets (including the assumption and/or assignment of the Assumed Contracts), and the objection deadlines set forth herein, and finds that such notice complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court.

4.      The Stalking Horse Bidder is approved as the "stalking horse bidder" as to the Mississippi Location, the Milton Location, and the Orlando Location.

5.      On account of the Stalking Horse Bidder's time, expenses, fees, costs, trouble and lost opportunity costs in respect of the transactions contemplated by the Stalking Horse APA, the Court finds that the Stalking Horse Expense Reimbursement is reasonable under the circumstances and approves the Stalking Horse Expense Reimbursement for the Stalking Horse Bidder in the amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) (the "**Stalking Horse**

**Expense Reimbursement**").  The Stalking Horse Expense Reimbursement shall be due and payable as set forth in paragraph 12 of this Order.

6.      A hearing (the "**Sale Hearing**") to consider approval of the Sale Motion and the Stalking Horse APA (including that it is the highest and best offer for the Assets) and to consider any timely filed objections thereto, and to consider approval of any higher and better offers for the Assets submitted in accordance with the Bid Procedures set forth in this Order, shall be held before the Honorable [] at the United States Bankruptcy Court, __on___.m.__ The Sale Hearing may be adjourned and/or continued in open Court from time to time without further notice.

7.      The Court approves the following procedures (the "**Bid Procedures**") for the submission and consideration of any written competing bid ("**Bid**") by any competing bidder ("**Bidder**") for the Assets:

(a)      Prior to the receipt by a prospective Bidder of any information from, and access to, the Debtors, each such Bidder will be required to execute a confidentiality and non-disclosure agreement in form and content acceptable to the Debtors (the "**NDA**"), to the extent not already executed.  Upon the execution of an NDA, each Bidder will be granted access to the Debtors' virtual data room.

(b)      At least five (5) business days prior to the Bid Deadline (as defined below), or such later date agreed to by the Debtors after prior consultation with the Consultation Party, a Bidder will be required to provide to the Debtors relevant background and financial information (including, without limitation, such Bidder's latest available audited and unaudited financial statements) satisfactory to the Debtors demonstrating the Bidder's financial ability to close and to consummate an acquisition of the Assets, such as (i) evidence of the Bidder's ability to assume or satisfy the terms and obligations of the Bidder's Agreement and pay the purchase price provided for therein and to provide adequate assurance of future performance by such Bidder of the Contracts, and/or (ii) an unconditional lending commitment from a recognized financial institution or cash sources in the amount of the cash consideration set forth in the Bid.  A Bidder (including the Stalking Horse Bidder) that timely submits the foregoing documents and information and that the Debtors determine, in consultation with the Consultation Party, is financially able to consummate the purchase of the Assets shall be a "**Qualified Bidder**" and shall be entitled to then submit a Bid for the Assets as described in paragraph 7(e) below.  The Stalking Horse Bidder is, and shall at all times remain, a Qualified Bidder and the bid submitted by the Stalking Horse Bidder a Qualified Bid.

(c)    Any Qualified Bidder desiring to make a Bid for all or any of the Assets shall deliver the Bid, by electronic mail transmission, to counsel to the Debtors, Daniel R. Fogarty, Esq., Stichter, Riedel, Blain & Postler, P.A., (dfogarty@srbp.com), and the financial advisors to the Debtors, Charles Reardon and Michael Freeman, Asgaard Capital, LLC, (creardon@asgaardcapital.com, mfreeman@asgaardcapital.com), **by no later than 5:00 p.m. (Eastern Prevailing Time) on [two business days before the Auction]** (or such later time or date agreed to by the Debtors) (the "**Bid Deadline**"). Upon receipt of a Bid, counsel to the Debtors shall deliver each such Bid, by electronic mail transmission, to (i) the Office of the United States Trustee, Attn: [     ], Esq., [     ] (@usdoj.gov), (ii) the Subchapter V Trustee, [     ], and (iii) counsel to any Qualified Bidder who submits a Qualified Bid.

(d)    **Notwithstanding anything to the contrary in these Bid Procedures, any Bidder may submit a Bid to purchase only such Assets owned by or utilized by the Debtors as it deems necessary or appropriate, whether any specific Assets owned or utilized by the Debtors are proposed to be purchased by the Stalking Horse Bidder pursuant to the Stalking Horse APA. By way of example but not by way of limitation, a Bidder may submit a Bid to purchase the Assets of a single Debtor or the Assets of more than one of the Debtors, only the Assets utilized at one Location or the Assets utilized at more than one Location, and so forth. There shall be no restrictions of any nature as to the number and type of Assets that a Bidder may seek to purchase.**

(e)    In order to be a qualified bid (a "**Qualified Bid**"), a Bid submitted by a Qualified Bidder must include, or be in compliance with, the following (unless any such item is otherwise waived in writing by the Debtors after prior consultation with the Consultation Party):

i.    A copy of the initial written purchase offer in the form of an asset purchase agreement, executed by such Qualified Bidder, in substantially the form of the Stalking Horse APA (collectively, the "**Bidder's Agreement**"); provided, however, that any Bidder's Agreement that contain terms or language different from the Stalking Horse APA must be black-lined to show any changes made by such Qualified Bidder to the form of the Stalking Horse APA, as the case may be. The Debtors may accept modifications to the Stalking Horse APA as submitted by a Qualified Bidder who otherwise complies with the Bid Procedures if the Debtors determine, in the exercise of their business judgment and after prior consultation with the Consultation Party, that the proposed modifications result in a higher and better offer for the Assets or the proposed modifications are necessary due to the fact that the Qualified Bidder is not seeking to purchase substantially all of the Assets.

ii.    An initial Bid with a purchase price above the total purchase price offered by the Stalking Horse Bidder in the Stalking Horse APA (the "**Stalking Horse Bidder Purchase Price**") in an amount equal to or greater than the total sum of the Stalking Horse Bidder Purchase Price plus cash in the amount of not less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), provided that, if the Bid is for less than all of the Assets, the initial Bid shall be an amount equal to

or greater than the Stalking Horse Bidder Purchase Price for the applicable Assets located at and/or related one (1) or more Locations and subject to the Bid, plus cash in the amount of not less than One Hundred Thousand and 00/100 Dollars ($100,000.00) (collectively, the "**Initial Overbid Amount**") per each location.  If a Bid is for the Assets at one (1) or more Locations, the Stalking Horse Bidder Purchase Price for the applicable Assets shall be the value ascribed to the Assets at such Location(s) as set forth in the Purchase Price Allocation (as defined in the Stalking Horse APA, but subject to Stalking Horse Bidder's ability to adjust the Purchase Price Allocation (as set forth in the Stalking Horse APA)). The cash portion of the Qualified Bidder's purchase price shall be payable, in immediately available funds, at the closing of the transaction. Any Bid for less than all of the Assets shall be for the purchase of all of the Assets located at and/or related to one (1) or more Locations.

iii.     Prior to the Auction, the Debtors, in their reasonable discretion and after consultation with the Consultation Party, shall have the right to (a) accept any Qualified Bidder's Bid as a stalking horse Bid for the Assets located at and/or related to less than all but for one (1) or more Locations provided that (i) such Bid is equal to or greater in amount than the Initial Overbid Amount attributable to the Assets located at and/or related to such Location(s) and that the sum of such Bid and the Initial Overbid Amount attributed to the Assets located at and/or related to the remaining Locations exceeds the amount of the stalking horse Bid, and (ii) such Bid is otherwise in compliance with the Bid Procedures, and grant customary bid protections for such stalking horse Bids including, without limitation, a breakup fee in an amount equal to the lesser of Fifty Thousand and 00/100 Dollars ($50,000.00) or three percent (3%) of the purchase price for the Assets contained in the stalking horse Bid, and (b) set reserve prices for the Assets located at and/or related to one (1) more Locations.

iv.     To the extent practicable, a statement that specifically sets forth the extent to which the Bid is higher and better than the offer set forth in the Stalking Horse APA, including an allocation of the cash components of the Bid to (A) the Assets and the Locations of each of the Debtors being purchased by the Qualified Bidder, (B) the claims against, and liabilities of, the Debtors being assumed as Assumed Liabilities.

v.     A designation of any executory contracts or unexpired non-residential real property leases such Qualified Bidder desires the Debtors to assume and/or assign to such Qualified Bidder under its Bidder's Agreement with the Debtors (the "**Designated Contracts**"), as well as a designation of any governmental approvals or consents required in connection therewith and, in the case of assumption and/or assignment, documents and information necessary to confirm adequate assurance of future performance by such Qualified Bidder pursuant to Section 365 of the Bankruptcy Code.  In the event that any of the Designated Contracts are not included in the list of Assumed Contracts set forth in the Stalking Horse APA, such Qualified Bidder shall, within one (1) business day of the Bid Deadline, serve a copy of this Order and Exhibit A attached hereto on

8

any party to such additional Designated Contract(s) and thereafter file a certificate of service with the Court.

vi.      The Bid shall not be contingent upon the receipt of financing or due diligence by the Qualified Bidder past the Bid Deadline.

vii.     The Bid shall provide that the Assets owned or held by the Debtors shall be sold on an "AS IS, WHERE IS" basis and the representations, warranties and covenants of the Debtors set forth in the Bidder's Agreement with the Debtors shall expire as of the closing of the sale transaction.

viii.    The Bid shall be valid and enforceable and binding on the Qualified Bidder through the closing date of its sale transaction.  The Bidder's Agreement shall be subject to acceptance by the Debtors solely by their execution thereof and necessary Court approval.

ix.      The Bid shall not contain any conditions precedent to such Qualified Bidder's obligation to purchase the Assets and assume and perform any liabilities to be assumed and to close the sale transaction, other than as may be included in the Stalking Horse APA or as agreed by the Debtors after prior consultation with the Consultation Party.

x.       A good faith deposit in the amount of not less than the lesser of (i) ten percent (10%) of the Initial Overbid Amount, but in no event less than Fifty Thousand and 00/100 ($50,000.00), or (ii) Two Hundred Thousand and 00/100 Dollars ($200,000.00) (the "**Bid Deposit**") shall be delivered by the Qualified Bidder, by wire transfer of immediately available funds, to SRBP by no later than the Bid Deadline (or such later time or date agreed to by the Debtors after prior consultation with the Consultation Party).  The Bid Deposit shall be deposited into a non-IOTA non-interest bearing trust account maintained by SRBP and shall be held in escrow subject to the terms of this Order.  SRBP will provide wire transfer instructions upon any request received from a Qualified Bidder.  Such Bid Deposit will be non-refundable to the Qualified Bidder in the event such Qualified Bidder's Bid is approved by the Court at the Sale Hearing as the highest and best offer for the Assets and such Qualified Bidder fails to close on the purchase of the Assets for any reason (subject to any conditions to closing set forth in its Bidder's Agreement approved by the Court).  The Bid Deposit will be applied against the purchase price paid to the Debtors by the Qualified Bidder at the closing.  Within fifteen (15) days following the entry of the Sale Order (as defined below), SRBP will return the Bid Deposit of any Qualified Bidder (except the Backup Bidder) that is not selected as having the highest and best offer for the Assets at the Sale Hearing. The Bid Deposit of the Backup Bidder shall be returned to the Backup Bidder as provided in paragraph 7(o) below.

xi.      Full disclosure of each entity that will be participating in such Bid (including, but not limited to, disclosure of any "affiliate" or "insider" (as those terms are defined in Sections 101(2) and 101(31), respectively, of the Bankruptcy

Code) of the Debtors that may have an interest in any such entity or any other person with an interest in, control over, or relationship with the Qualified Bidder) in order to satisfy the requirements set forth in Sections 363(m), 363(n), 365(b), and 365(f)(2) of the Bankruptcy Code. On or before the Bid Deadline, the Stalking Horse Bidder shall simultaneously submit the foregoing disclosure to the Debtors.

xii.    The Bid shall set forth (A) any applicable governmental, regulatory, or other approvals and any applicable consents that would be required to be obtained were the Qualified Bidder to be the Successful Bidder, (B) all actions taken or to be taken to obtain such approvals or consents, (C) any approvals or consents obtained, and (D) the Qualified Bidder's best estimates as to the likelihood and timing of any such approvals or consents. On or before the Bid Deadline, the Stalking Horse Bidder shall simultaneously submit the foregoing information to the Debtors and the Consultation Party.

(f)    An auction (the "**Auction**") to consider any competing Qualified Bids in respect of the Assets will be held at the offices of Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602 (or at such other location designated by the Debtors in Tampa, Florida) **on    .m.** (or such later time or date agreed to by the Debtors, after prior consultation with the Consultation Party, or as may be scheduled by the Court). By no later than 5:00 p.m. on      ,      the      Debtors,      after consultation with the Consultation Party, will advise each of the Qualified Bidders as to whether its Bid is a Qualified Bid and whether an Auction will be held as scheduled above. All potential Qualified Bidders or their authorized representative(s) with full authority to participate in the Auction must be present in person at the Auction. Requests to participate by video conference will be considered on a case-by-case basis.

(g)    The Debtors will file a notice with the Court at least one (1) day prior to the date of the Auction indicating the number of Qualified Bids received and the names of the Qualified Bidders, and will serve such notice, along with copies of the Qualified Bids, by electronic mail transmission, on counsel to or representatives of all Qualified Bidders.

(h)    The Debtors and their professionals shall direct and preside over the Auction. The Auction will be conducted in rounds. To maximize the value of the Assets for the estates and all creditors, the Auction will be conducted to allow bidding each round on all or less than all Assets, as established by the Debtors and their professionals; provided, however, that the Debtors will not consider as a higher or better offer a bid that provides less for the Assets of one of the Debtors than would be provided for the Assets of such Debtor in a bid for all of the Assets. Bidding will begin at the purchase price stated in the highest and best Qualified Bid or combination of Qualified Bids (the "**Initial Bid**") as selected by the Debtors in consultation with the Consultation Party prior to the commencement of the Auction and announced at the start of the Auction. All subsequent bids at the Auction above the Initial Bid (including any subsequent bid which may be made by the Stalking Horse Bidder) must be in incremental increases of at least One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "**Subsequent Overbid Amount**" and, together with the Initial Overbid Amount, the "**Overbid Amounts**"). For the avoidance of doubt, the Stalking Horse Expense Reimbursement shall be credited to each bid of the

10

Stalking Horse Bidder made at the Auction for all the Assets. The Debtors shall have the ability to alter the bid increments at the Auction to maximize the value of the Assets for the estates.

(i)     Any Qualified Bidder (including the Stalking Horse Bidder) shall be entitled to submit further bids at the Auction. Any successive bid submitted at the Auction shall be irrevocable through the Auction process unless and until it is declared to not be the highest and best bid. The allocation of any higher and better increased bid amounts submitted at the Auction between the Assets of the Debtors as applicable shall be resolved by the Debtors after prior consultation with the Consultation Party. At the Auction, the Debtors may request a Qualified Bidder to provide additional information demonstrating the Qualified Bidder's financial ability to close and to consummate an acquisition of the Assets. The competitive bidding process among Qualified Bidders at the Auction shall continue according to the Bid Procedures until the Debtors determine, in the exercise of their business judgment and after consultation with the Consultation Party, that one or more Qualified Bidders have made the highest and best offer to purchase the Assets, either through a single Qualified Bid for all of the Assets or through more than one Qualified Bid for separate Assets.

(j)     The Debtors, after prior consultation with the Consultation Party, may continue or adjourn the Auction from time to time with reasonable notice to the Qualified Bidders. The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent with the Bid Procedures.

(k)     At the Sale Hearing, the Debtors will inform the Court of the results of the Auction and will recommend to the Court the Qualified Bid or combination of Qualified Bids that they consider to be the highest and best offer(s) for the Assets, after taking into account all aspects of the Stalking Horse APA, the Qualified Bids and the Bidder's Agreement (including, without limitation, the amount of the purchase price, the method and timing of the payment of the purchase price, any contractual adjustments to the purchase price, any liabilities of the Debtors to be assumed, the provision for adequate assurance of future performance of the Assumed Contracts, any conditions to closing, the time for closing, and the representations, warranties, and covenants to be provided by the Debtors, prior to closing). The value of a Qualified Bid, for purposes of these proceedings, shall be determined by comparing, among other things, (i) the type, number and nature of any changes in the Bidder's Agreement requested by each Qualified Bidder, (ii) the extent to which such modifications are likely to delay the closing of the sale to such Qualified Bidder, and the cost to the Debtors and their estates of such modifications or delay, (iii) the extent to which such Qualified Bid includes the purchase of all or less than all of the Assets, (iv) the type and amount of consideration to be received by the Debtors' estates, individually and collectively, (v) the existence of any financing, due diligence or other contingencies, (vi) the amount of any cure payments, which, if paid, would reduce the proceeds available for distribution to creditors of the Debtors, (vii) the provision for adequate assurance of future performance of the Assumed Contracts, (viii) the likelihood of the Qualified Bidder's ability to close the sale transaction, including the likelihood of receipt by such Qualified Bidder of the necessary approvals with respect to the Assumed

Contracts following the closing, and (ix) the net benefit to the Debtors' estates and their creditors, including but not limited to the amount of proceeds to be received by the Debtors individually and collectively from one transaction for the purchase of all of their Assets as compared to the aggregate proceeds to be received by the Debtors from piecemeal sales of their Assets. All Qualified Bidders or their authorized representatives must be present at the Sale Hearing. The Court will determine the highest and best offer for the Assets at the Sale Hearing. ANY SALE WILL BE SUBJECT TO APPROVAL OF THE COURT.

(l)     Prior to the Auction, the Debtors, in their reasonable discretion and after consultation with the Consultation Party, shall have the right to reject any and all Bids other than any Bid that is a Qualified Bid.

(m)     If any Bid does not conform to all of the requirements set forth above, such Bid will not be considered by the Court or be admissible at the Sale Hearing, unless otherwise agreed by the Debtors, after prior consultation with the Consultation Party, or otherwise ordered by the Court.

(n)     The Qualified Bidder whose Qualified Bid is selected by the Court at the Sale Hearing as the highest and best offer for the Assets shall be deemed the "**Successful Bidder**".

(o)     The Court shall register the second highest Qualified Bid and Qualified Bidder (the "**Backup Bidder**"), whose Bidder's Agreement shall be a binding contract with the Debtors, respectively, and who shall close, without the necessity of further Court order, in the event the Successful Bidder fails to consummate the acquisition of the Assets in accordance with its Bidder's Agreement and the order granting the Sale Motion (the "**Sale Order**"). Any closing with the Backup Bidder shall occur within ten (10) days of written notification to the Backup Bidder that the Successful Bidder failed to close. The Bid Deposit of the Backup Bidder shall be retained by SRBP until the closing of the sale with the Successful Bidder, and shall be returned to the Backup Bidder within two (2) business days following such closing. In the event the Successful Bidder fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Successful Bidder), the Debtors shall keep the Bid Deposit of such Successful Bidder (or the Deposit in the case of the Stalking Horse Bidder) and the Debtors or their estates reserve the right to pursue all available remedies, whether legal or equitable, available to the Debtors against such party. In the event the Successful Bidder fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Successful Bidder), and the Backup Bidder thereafter fails to close on the sale transaction in accordance with its Bidder's Agreement (or the Stalking Horse APA in the event that the Stalking Horse Bidder is the Backup Bidder), the Debtors shall keep the Bid Deposit of such Backup Bidder (or the Deposit in the case of the Stalking Horse Bidder) and the Debtors or their estates reserve the right to pursue all available remedies, whether legal or equitable, available to the Debtors against such party.

(p)     At the Sale Hearing, the Debtors will request that the Court make certain findings regarding the Auction, including, among other things, that (i) the Auction was

conducted and the Successful Bidder and the Backup Bidder were selected in accordance with the Bid Procedures, (ii) the Auction was fair in substance and procedure, (iii) the bids of the Successful Bidder and the Backup Bidder were Qualified Bids as defined in this Order, and (iv) consummation of the sale contemplated by the bid of the Successful Bidder will provide the highest and best value for the Assets and is in the best interests of the Debtors, their estates, and their creditors. At the Sale Hearing, the Debtors will also request that the Court find that each of the Successful Bidder and the Backup Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code such that the reversal or modification on appeal of the sale of the Assets to the Successful Bidder or the Backup Bidder shall not affect the validity of the sale to the Successful Bidder or the Backup Bidder, whether or not the Successful Bidder or the Backup Bidder knew of the pendency of the appeal.

(q)     After the Sale Hearing, the Debtors shall submit to the Court a proposed Sale Order authorizing and approving the Bidder's Agreement executed by the Successful Bidder or the Backup Bidder, as applicable (or the Stalking Horse APA if such party is the Stalking Horse Bidder), and authorizing the Debtors' execution of, entry into, and consummation of the Successful Bidder's or the Backup Bidder's, as applicable, Bidder's Agreement (or the Stalking Horse APA if such party is the Stalking Horse Bidder).

(r)     All Qualified Bidders, the Successful Bidder, and the Backup Bidder shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Bid Procedures, the Auction, or the sale of the Assets.  All purchase agreements shall be governed by and construed in accordance with the laws of the State of Florida.

(s)     Except for the Stalking Horse Bidder, or as provided in paragraph 7(e)(iii) above, no Bidder submitting any Bid shall be entitled to any expense reimbursement or any break-up, termination, or similar fee or payment.

8.     Any creditor or other party in interest objecting to the Sale Motion or the sale of the Assets to the Stalking Horse Bidder or the Stalking Horse APA must file written objections with the Court and serve same upon counsel to the Debtors **by no later than 5:00 p.m. (Eastern Prevailing Time) on [        ]**, without prejudice to the Debtors conducting the Auction as described above.  Any such objection shall set forth with specificity the grounds for such objection. Any creditor or other party in interest not timely filing such written objection shall be conclusively deemed to have waived any objection it may have to (i) the sale of the Assets to the Stalking Horse Bidder, (ii) the Stalking Horse APA, or (iii) the selection of the Stalking Horse Bidder's offer as

the highest and best offer for the Assets.  Any timely filed objections to the Sale Motion or the sale of the Assets will be heard at the Sale Hearing, as well as any objection to the Bid of any other Qualified Bidder or the conduct of the Auction (which objections may be made at the Sale Hearing).

9.      On or prior to [        ], the Debtors shall file with the Court and serve on each counterparty to an Assumed Contract that the Debtors may assume and/or assign to the Stalking Horse Bidder (or another Qualified Bidder if the Stalking Horse Bidder is not the Successful Bidder or the Backup Bidder), a notice of assumption and/or assignment as to the Assumed Contracts in substantially the form of the Contract Assumption Notice attached hereto as Exhibit A.

10.      Any lessor or other party to any Assumed Contract to be assumed and/or assigned to the Stalking Horse Bidder (or another Qualified Bidder if the Stalking Horse Bidder is not the Successful Bidder or the Backup Bidder) that objects to, and/or asserts any cure claims, defaults or any other claims against the Debtors in connection with, the proposed assumption and/or assignment of its Assumed Contract must file with the Court, **by no later than 5:00 p.m. (Eastern Prevailing Time) on  **, any objection to the assumption and/or assignment of its Assumed Contract and/or assertion of claim or default in connection with its Assumed Contract (a "**Contract Objection**"), which Contract Objection shall set forth:

    a.      the specific grounds for such Contract Objection;

    b.      any and all defaults of the Debtors (whether monetary or non-monetary) that it alleges are in existence under such Assumed Contract and, (i) if such alleged defaults are monetary, the nature of such monetary defaults (including the date and amount of any payment allegedly due under the Assumed Contract) and cure amounts, if any, due and owing by the Debtors pursuant to 11 U.S.C. §365(b) and, (ii) if such alleged defaults are non-monetary, the nature of such non-monetary defaults and the amount of money or the type of action required to cure such non-monetary defaults, and in each such case applicable and appropriate documentation in support of such alleged defaults; and

c.    any and all claims of any nature whatsoever against the Debtors.

11.    Any lessor or other party to any Assumed Contract who fails to timely file a written Contract Objection to the proposed assumption and/or assignment of its Assumed Contract as set forth above shall be conclusively deemed to have waived, and shall be forever barred from asserting, any such Contract Objection and to have consented to the assumption and/or assignment of its Assumed Contract to the Successful Bidder or any Backup Bidder.  Any lessor or other party to an Assumed Contract not specifying any default or claim as required herein shall be deemed to have conclusively acknowledged that no default or claim exists under any such Assumed Contract. In the event that the Stalking Horse Bidder is not the Successful Bidder, any lessor or other party to any Assumed Contract may raise objections at the Sale Hearing to adequate assurance of future performance by the Successful Bidder.

12.    The Stalking Horse Expense Reimbursement shall only be due and payable in the event that (i) the Stalking Horse Bidder remains willing, and is able, to proceed with the transactions contemplated by, and is not in breach of any of its obligations under, the Stalking Horse APA, and (ii) is not the Successful Bidder at the Auction  for any of the Assets, and (iii) the Assets of the Debtors including any Carved-Out Assets are actually sold to a party or combination of parties other than the Stalking Horse Bidder (an "**Alternative Transaction**").  The Stalking Horse Expense Reimbursement, if earned, shall be (a) allowed as a super-priority administrative expense claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code to be paid of any other claims, including other administrative expense claims, and (b) payable to the Stalking Horse Bidder only upon the closing of the Alternative Transaction.  The Stalking Horse Expense Reimbursement shall be paid out of the proceeds of the sale of the Assets at the closing of such sale.  In the event that only a portion of the Assets are sold to a Qualified Bidder other than the

Stalking Horse Bidder: (a) the Stalking Horse Expense Reimbursement and the Stalking Horse Bidder's Bid Deposit shall be calculated as set forth in the Stalking Horse APA; and (b) Stalking Horse Bidder will retain certain rights to terminate the Stalking Horse APA, as set forth in the Stalking Horse APA.

13.     The Court finds that the Bid Procedures, including the Overbid Amounts, are reasonable under the circumstances and approves the Bid Procedures, including the Overbid Amounts, in connection with any Bids to purchase the Assets.

14.     The granting of the Motion as set forth herein shall not constitute the approval of any sale of the Assets or any term or provision of the Stalking Horse APA, except with regard to the Stalking Horse Expense Reimbursement and the Overbid Amounts specifically approved herein and the other terms provided in this Order.  All parties reserve all rights and defenses with respect to the Sale Motion and the Stalking Horse APA.

15.     To the extent there is any inconsistency between the provisions of this Order and the terms of the Stalking Horse APA, the provisions of the Stalking Horse APA shall control.

16.     This Court retain exclusive jurisdiction over any matter or dispute relating to the sale of the Assets, the Bid Procedures, the Auction, or any other matter or agreement (including any asset purchase agreement) that in any way relates to the foregoing.  Any party disputing the Bid Procedures or any other matter that in any way relates to the foregoing shall file an objection with the Court as soon as practicable to facilitate resolution of the objection.

Attorney Daniel R. Fogarty is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and to file a proof of service within three (3) days of entry of the Order.

4863-6200-0773, v. 6

**Exhibit A**

**Contract Assumption Notice**